### TEXAS CO. v. GLOBE OIL & REFINING CO.

Civ. A. 3783.

United States District Court
N. D. Illinois, E. D.

May 18, 1953.

12. See note 7, supra.

13. 310 U.S. 16 at pages 31, 32, 60 S.Ct. 749, at page 757.

458

George I. Haight, Edward A. Haight and Schneider & Dressler, Chicago, Ill., and Brady Cole, Houston, Tex., for the plaintiff.

Thiess, Olson & Mecklenburger, Chicago, Ill., for the defendant.

CAMPBELL, District Judge.

This is a suit for patent infringement; Texas charges that Globe, at or near Lemont, Illinois, and elsewhere, has infringed U. S. Patent No. 1,883,850, applied for November 21, 1918, and issued on October 18, 1932, to Texas as assignee of the applicant Otto Behimer. (The original application had been by Holmes, Manley and Behimer; prior to the patent issuance, Behimer had become the sole applicant.) The patent in suit is based on a divisional application dated April 6, 1923. It consists of a specification of 3½ pages plus a diagrammatical drawing, and of 44 claims extending over 6 printed pages. The 5 claims in suit (12, 22, 36, 39 and 40) relate to a process of oil conversion sometimes called "thermal cracking", whereby the oil is passed once through a heating coil or heating zone, where it is raised to a cracking temperature, thence to a second zone where the vapors are evolved and where the residue is removed without re-circulation; the lighter vapors are drawn off as the desired product; but the heavier vapors are passed into a reflux condenser and thence returned under maintained mechanical pressure to the charging line leading to.the heating coil and so re-circulated.

Globe's answer alleges (*inter alia*) that its method of making gasoline is wholly different in fundamental principles of operation and in result, from the process disclosed and claimed by the patent in suit; that the patent, if construed to be infringed by any practice of defendant, is invalid because it does not contain any patentable novelty in view of the prior art; that Behi-

mer was not the original inventor of the alleged invention; that the claims of the patent do not cover valid and patentable combinations; that long prior to the making of the alleged invention and more than 2 years prior to the application date, the alleged invention, or substantial and material parts thereof, were described, shown and patented in certain patents (naming them); that the alleged invention of the patent in suit and every substantial and material part thereof were, prior to Behimer's date of invention, known and invented and reduced to practice by one Ellis and one Alexander, who respectively filed patent applications on which U. S. patents issued; that plaintiff has stood inactive for many years with full knowledge of defendant's operation, and has been guilty of laches; that during the course of the prosecution of the application for the patent in suit and during an interference with one Dubbs, plaintiff disclaimed and abandoned the subject matter of the interferences and failed to amend the claims so as to patentably distinguish them from the subject matter thus disclaimed and abandoned; that this disclaimer was executed pursuant to settlement agreement between Texas and Universal Oil Products Company, whereby the alleged invention was apportioned between them and the monopoly of the previously issued Dubbs patent extended beyond the statutory period; that the patent in suit is invalid because neither plaintiff nor Behimer, at the time of the filing of the original application, knew of any commercial means for return of hot reflux to the heating coil inlet.

The patent in suit, the 5 claims in suit (and some others) and many of the issues here involved, have been heretofore litigated in Texas Co. v. Anderson-Prichard Refining Corporation, 10 Cir., 1941, 122 F.2d 829, affirming the decree of the District Court holding the patent valid but not infringed, 32 F.Supp. 347. Defendant submits this decision as persuasive; plaintiff denies that the decision is persuasive and says that the record here is substantially different.[1]

---

1. There are certain other related cases concerning oil cracking in general and some of the patents and parties in interest here in particular, which are of

Trial was before a master; from his report and the accompanying record, it appears that on each side the case has been exhaustively prepared and presented. The hearings occupied 71 court days; the transcript consisted of over 10,000 typewritten pages; numerous exhibits were offered by each side. The oral argument occupied 11 court days; the transcript thereof consists of over 1700 pages. The respective parties submitted to the master numerous printed Findings of Fact and Conclusions of Law, and printed Briefs aggregating over 1400 printed pages. (The master originally issued a draft report and served notice that counsel might file objections thereto; both parties filed objections and subsequently argued these objections; the master then issued his definitive report, being the document now under consideration.) The report is a lengthy document, consisting of 436 printed pages: it makes detailed Findings of Fact—294 in number and states detailed Conclusions of Law—129 in number. The master found against defendant on all its defenses except the construction of the claims; he concluded that the claims, properly construed, did not cover defendant's operation and recommended that the suit be dismissed. The matter comes up before me on this report and on the objections thereto filed by plaintiff (69 in number and taking 53 printed pages) and by defendant (148 in number and taking 27 printed pages). The respective counsel have also filed several supporting printed briefs.

The process of the claims in suit, and the defendant's operation, have the same general objective, i. e., to crack or decompose the heavier hydrocarbons into lighter constituents, specifically gasoline. Some forms of cracking ante-dated Behimer. Before his invention, it was well known in the art that cracking could be brought about by subjection of the heavier materials to a proper temperature for a sufficient time; commercial cracking processes to make gasoline had been successfully carried out by heating and cracking in directly fired zones or containers, sometimes drums or tanks, sometimes tubes or coils. As of November, 1918, the date of Behimer's original application, there were in commercial operation, two schools of cracking. The one was the "liquid phase" method where a body of liquid oil was cracked and distilled, generally in a receptacle (usually a tank or drum) maintained under superatmospheric pressure so as to increase the boiling point to such a temperature that the oil would crack while still in liquid form; the other was the "vapor phase" method, where the oil was heated and vaporized either completely or to a substantial degree, and then cracked. The liquid phase method operated at low temperature and with a long time factor, the vapor phase method, at high temperature and with a short time factor; the liquid phase product was a white, sweet natural gasoline low in unsaturates, the vapor phase product was unlike natural gasoline in that it was of bad color, had a foul odor and was rich in unsaturates. Originally the liquid phase product was much preferred commercially. However, with the further development in the 1920's of the high compression automobile engine, it became desirable to procure gasoline of high octane content, the so-called "anti-knock" gasoline, and it was found that the vapor phase prod-

some possible relevancy: Universal Oil Products Co. v. Winkler-Koch Engineering Co., D.C.Del., 1934 Nields, D.J., 6 F. Supp. 763. Action for infringement of two process patents for production of gasoline by cracking cheap petroleum oil, namely No. 1,392,629 to C. P. Dubbs (hereinafter referred to) and No. 1,537,-593 to G. Egloff. Decree for plaintiff, finding each patent valid and infringed; affirmed on appeal, Root Refining Co. v. Universal Oil Products Co., 3 Cir., 1935, 78 F.2d 991; years later vacated because of fraud and conspiracy between plaintiff's attorney and the circuit judge. Id., 3 Cir., 1948, 169 F.2d 514.

Universal Oil Products Co. v. Globe Oil & Refining Co., (D.C.N.D.Ill.1941, Holly, D.J.,) 40 F.Supp. 575. Patent infringement action by Universal against Globe for infringement of the same Dubbs patent No. 1,392,629, and the same Egloff patent, No. 1,537,593. The court dismissed the bill holding the Dubbs patent not infringed and the Egloff patent invalid for want of invention. Affirmed on appeal, 7 Cir., 137 F.2d 3 and 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399.

uct had these high-octane properties and was, therefore, more suited from this standpoint for the high compression engines than the previous liquid phase product, or the natural gasoline. The result has been that the natural gasoline and the liquid phase cracked product both yielded in desirability to the vapor phase cracked product.

In ante-Behimer processes, the principal difficulty was that the subjection of the hydrocarbon stocks to the heat necessary to crack them, produced not only the desired lighter product, but also carbon and heavy carbonaceous materials. This carbon tended to deposit on the highly heated surfaces of the metal "firing zone;" the metal became insulated, was apt to overheat and decrease in strength; the "firing zone" whether drum, tank, coil or tube, was prone to bulge, crack or burst. This was the "carbon problem" that was then so important and so difficult in the practice of the cracking art. Behimer's invention (as his specification explicitly states) was concerned with this carbon problem and had a solution for it. Instead of heating and cracking in the same zone, Behimer's idea was to have two zones, one a heating zone in which the charging stock would be heated under super-atmospheric pressure to a temperature just under cracking, and a second zone, unheated or lightly heated, into which the liquid would be deposited from the first zone—and in which second zone, the liquid would be allowed to remain for a comparatively long period and in which the actual cracking would take place. This second, or cracking zone had two outlets; one from which the the carbon residue was drawn away; the other from which part of the cracked liquid passed out to constitute the desired product. In this way, there was only a small or incipient cracking in the "heating zone" and consequently, no harmful deposit of carbon there; the carbon deposit was all in the second or cracking zone, where it could be drawn away with no harmful consequences. Claim 12 in suit is typical and reads as follows:

"12. A process of oil conversion that comprises passing the oil once through a heating coil where it is raised to a cracking temperature and into a drum where a substantially constant body of liquid oil is maintained and vapors evolved, separating the heavier constituents of the evolved vapors and returning them while still hot and without substantial drop in pressure under mechanical pressure to the heating coil for retreatment, removing residuum from the drum while preventing recirculation of residuum through the coil, maintaining super-atmospheric pressure through the coil and drum and continuously supplying charging stock to the process."

Plaintiff contends that an essential feature of the patent in suit and of the claims in suit is "clean circulation", which plaintiff defines as a continuous coil and drum pressure cracking operation, whereby cracked residual oils are withdrawn from the drum and discharged from the system; the separated vapors pass from the drum into a dephlegmator, in which vapors heavier than gasoline are condensed as reflux and the reflux from the dephlegmator is directly returned while hot to the heating coil and is forced under mechanical pressure through the coil with the fresh oil supplied thereto. This feature is set out in specification,[2] where, after describing "the process of coil heating, drum cracking, and permanent withdrawal of residue," and after stating that the process "in its broad conception" is then complete (p. 1, ll. 81–82) Behimer describes an additional preferable step as follows (p. 1, ll. 82 et seq.):

"* * * the light products *preferably* continue the cycle, leaving the cracking zone in the form of vapor and gas. These vapors and gases are then subjected to a reduction in temperature, whereby the heavier constituents thereof, such as kerosene, are condensed. The condensate *preferably* is combined with the charging oil entering the heating zone, thus completing the cycle." (Emphasis supplied)

2. But not in those words; the phrase "clean circulation" is nowhere found in the Behimer patent.

There were issued out of the Behimer Patent Application, a total of four patents, namely: (a) No. 1,585,496, issued May 18, 1926, Reissue No. 16877 issued February 14, 1928 (on a divisional application), sometimes referred to as "starting-up" patent. (5 claims) (b) No. 1,840,012, issued January 5, 1932, on a divisional application, sometimes referred to as the "apparatus" patent. (2 claims) (c) No. 1,883,850, issued October 18, 1932, on a divisional application (the patent in suit) (44 claims). (d) No. 2,027,014, issued January 7, 1936, on the parent application, sometimes referred to as "postponed cracking" patent. (23 claims).

Defendant's operation is under what is known as the Winkler-Koch process. This process was developed in the late 1920's by Lewis E. Winkler and Fred G. Koch, experienced petroleum engineers; it is not patented. In 1930, the Winkler-Koch process was first put into operation in defendant's plant at Lemont, Illinois. The record contains written stipulations by the parties as to the nature of defendant's operation, which appears to be as follows: There are 2 cracking furnaces, No. 1 and No. 2. In each furnace is located a coil consisting of 5 banks of tubes, each tube approximately 27 feet long, 3 inches (Inner Diameter); each coil is approximately one mile long and the oil completes its passage through the coil in about 5 minutes. The charge enters the furnace coil at sub-cracking temperature of 610° in each furnace with a pressure in furnace No. 1 of 555 lbs. and in furnace No. 2 of 763 lbs. In the coils, the oil is raised to a maximum outlet temperature of 935° in furnace No. 1; 925° in furnace No. 2; under an outlet pressure in each furnace of 350 lbs. In the passage of the oil through the coils, substantial and principal cracking takes place; vapors are formed in the coils travelling along with the liquid as a foamy mass and are subjected to the same conditions of time and temperature as the liquid. The two streams (each part oil and vapor) after leaving their respective cracking furnaces, are joined together and the united stream passes through a pressure release valve where the pressure is reduced from 350 lbs. to about 42 lbs. Beyond this valve the hot stream is met by a cooler (relatively) stream of topped crude oil from the pre-heater furnace (outlet temperature 765°, pressure 89 lbs.) and the combined streams enter a vapor separator consisting of a vertical still 8½ feet in diameter and 34 feet high. The reduction in pressure of the streams from the cracking furnace, plus the quenching of these streams by the cooler topped crude, results in a reduction of temperature of the oil in the bottom of the vapor separator to 815°. No liquid level is maintained in the vapor separator. From the bottom of the vapor separator, the heavy liquid residue is led off to a small vertical drain drum through a pipe having a control device located 2 feet above the bottom of the drain drum. In the drain drum, there is maintained only enough heavy liquid residue (amounting to approximately 2 barrels) necessary to provide a liquid seal to prevent the escape of vapors down the residue withdrawal line; the balance of the heavy liquid residue is withdrawn and not returned to the system. The vapors further pass (through a heat exchanger) to a bubble tower, 12 ft. in diameter, 66 ft. high, where they are subjected to partial condensation and are cooled to a temperature of 315° at the top of the tower. The vapor constituents heavier than gasoline are condensed and separated from the lighter vapors which contain gasoline; these lighter vapors constitute the final product of the process and then pass on to final condensation as gasoline. The liquid in the bottom of the bubble tower is a mixture of the insufficiently cracked material or reflux from the cracking coils, and of the charging stock made by distillation of the topped crude. This material is continuously withdrawn from the bottom of the bubble tower and is pumped as charging stock to the two cracking coils. Intermediate products are withdrawn by side streams from the bubble tower; from the higher side stream at 426°, cracked naphtha and from the lower side stream at 477°, cracked distillate. In defendant's operation the oil is cracked in the coils, about 15% by volume of the stream being

converted to gasoline of 355° end point. At the outlet of the coils, the oil has been vaporized to about 90% by weight, and about 96% by volume of the tube space, and the stream has acquired a velocity of about 40 ft. per second. As vapors form in the coil, they travel along with the liquid as a foaming mass, and are subjected to the same cracking conditions of time and temperature as the liquid. As cracking proceeds, lighter products, including gasoline, and also heavier products are formed, and are mingled in the cracking coil with the combined stream of clean reflux and fresh feed. About 1% of the total gasoline made in the system is made in the vapor separator. Of the gasoline formed by cracking in the coil of No. 1 cracking furnace, 60% was produced by liquid phase cracking; of the gasoline formed by cracking in the coil of No. 2 cracking furnace, 67% was produced by liquid phase cracking.

Defendant in its process and operation, meets the carbon problem by avoiding the deposit of carbon in substantial quantities anywhere in its system. It does this by: charging only a clean stock to the cracking coils, such clean stock consisting of clean fresh feed and clean reflux; using cracking furnaces of modern design; regulating the process with automatic control instruments; using high temperatures and short time factors in the cracking coils; regulating the crack per pass therein to a point short of that where carbon in harmful amounts would be deposited; stopping the cracking operation in the vapor separator save for the unavoidable incipient cracking resulting from the distillation of the topped crude; using a high velocity in the cracking coils; withdrawing and not returning to the system the carbon laden residue resulting from the cracking operation. Defendant's operation solves the carbon problem by cracking in the coil at a high temperature with a short time factor and then depositing the oil, after quenching and a pressure reduction, in the vapor separator (this vapor separator corresponding to the Behimer drum); defendant's operation includes a continuous charge; and it also includes "clean circulation,"

that is permanent removal of residue from the vapor separator (drum) and direct pump return of the hot reflux to the charging line. There is a verbal correspondence between the language of at least some of the claims in suit and that of defendant's operation; for example, between the different elements of claim 12 and defendant's process in that each of the elements of the claim is found in defendant, namely: 1. passing the oil once through a heating coil where it is raised to a cracking temperature, 2. and into a drum where a substantially constant body of liquid oil is maintained and vapors evolved, 3. separating the heavier constituents of the evolved vapors, 4. and returning them while still hot and without substantial drop in pressure under mechanical pressure to the heating coil for retreatment, 5. removing residuum from the drum while preventing recirculation of residuum through the coil, 6. maintaining superatmospheric pressure through the coil drum, 7. and continuously supplying charging stock to the process.

Plaintiff's contention, reduced to its simplest form, is that defendant's process infringes Behimer because Behimer is broad enough to include not only heating in the coil (the firing zone) and cracking in the drum (the second zone), but also cracking in the coil. Defendant's position is that Behimer properly construed, discloses only incipient cracking in the coil and requires that substantially all the cracking take place in the drum; moreover, defendant alleges that if Behimer patent were susceptible of plaintiff's broad construction, it would be invalid on the prior art. Plaintiff's further contention—again reduced to its simplest form—is that the Behimer patent includes an independent invention of "clean circulation;" i. e., withdrawal of the residue from the cycle and forcible return of the hot reflux condensate to the coil inlet. Defendant denies that Behimer had any independent invention of clean circulation; further, that Behimer by his disclaimer in the Patent Office had abandoned "clean circulation" generally and had retained only "clean circulation with a pump" and that

this limited claim could not be the subject of a valid patent since a pump was not a patentable element.

This disclaimer issue occupies a ∙ substantial part of the record. As already noted, the original Behimer application had been filed on November 21, 1918, although the patent in suit did not issue thereon until October 18, 1932, almost 14 years thereafter. On March 19, 1919, one C. P. Dubbs filed an application on which patent No. 1,392,629 issued October 4, 1921 —while the Behimer application was still pending. On December 26, 1922, Behimer presented claim 42 in his application: the Patent Office held that it covered subject matter substantially identical with that covered by certain claims of the issued Dubbs patent, except that Behimer did not have Dubbs' first step limitation against permitting "substantial vaporization of the oil in bringing it to a cracking temperature," which difference the Patent Office held to be immaterial. At the request of the examiner, Behimer copied certain claims of the Dubbs patent, and on June 8, 1923, interference No. 49,355 was declared between Behimer and Dubbs; all the counts called for residue withdrawal and return of reflux, without specifying any particular method of reflux return. On December 12, 1918, Dubbs had filed another application No. 266,396 containing claims which were indistinguishable from those of his (later issued) patent No. 1,392,629 except (1) that they were not limited to "without substantial vaporization" in the coil (as were the claims in the '629 patent) and (2) that they included the return of the reflux with a pump (the '629 patent did not specify any means of returning reflux). The Patent Office rejected this second Dubbs application as double patenting; Dubbs appealed and procured a reversal holding that the addition of the element of mechanical pressure for returning the reflux, differentiated this application from the prior Dubbs and that the new process (embracing the mechanical pressure step) was patentable. The Dubbs pump claims were therefore incorporated in a Divisional Dubbs application and because of their identity in subject matter

with certain claims of the pending Behimer application, a second Behimer-Dubbs interference No. 55,610 was declared on July 15, 1927. The counts did not contain any limitation to operations "without substantial vaporization" in the heating coil; the issue was priority of invention of the concept of clean circulation with forced mechanical return of reflux. Both Interferences lay dormant for many years. In December, 1931 (pursuant to an agreement between Universal Oil Products, as assignee of Dubbs, and Texas, as assignee of Behimer) Behimer entered a disclaimer in the clean circulation Interference No. 49,355 and Dubbs entered a disclaimer in the pump Interference No. 55,610. Thereafter, in Behimer's Divisional application, all claims not already limited to a pump were rejected on the issue of clean circulation Interference No. 49,355 and on the alleged prior art patent to Trumble No. 1,281,884. Behimer did not appeal from the rejection, but acquiesced therein and on July 8, 1932, he amended and rewrote the claims to include specifically the element of reflux return "under mechanical pressure." Upon termination of Interference No. 55,610 by Dubbs' disclaimer, all the claims of the Behimer application, including return of reflux under mechanical pressure, were allowed.

Before taking up the main issues of the case, there is a special defense that requires mention. Defendant charges plaintiff with laches. On this issue, it appears that the Behimer patent issued October 18, 1932, and that the instant suit was brought January 10, 1942. (The actual trial, by agreement of counsel, was postponed until after the end of World War II and did not commence until April, 1947). Defendant argues that the 9 year delay from October, 1932 to January, 1942, shows laches. The record disclosed that during this 9 year period, plaintiff had not stood idle but had vigorously asserted the validity of the Behimer patent, and plaintiff's intention to sue infringers; that plaintiff had actually started many infringement suits on this patent in the several courts throughout the country against other members of the Winkler-Koch group.

This group was so called because they all purchased and operated the Winkler-Koch cracking still and contributed to a fund to be used in the defense of patent suits brought against any user; defendant was a member of this group and made substantial contributions thereto. Many of these defendants later settled by taking licenses from plaintiff; defendant here negotiated for years with plaintiff for a license but no agreement was reached. Defendant introduced evidence of substantial expenditures made by it in expanding its plant at Lemont, Illinois, some of these expenditures before the filing of the present suit, some thereafter. I agree with the master's holding that defendant was never lulled into any sense of security, that defendant from the time of the issuance of the Behimer patent knew that plaintiff claimed defendant was infringing. There was no equitable estoppel here as in Dickerson v. Colgrove, 100 U.S. 578, 580, 25 L.Ed. 618, or Lukens Steel Co. v. American Locomotive Co., 2 Cir., 1939, 197 F.2d 939. Brennan v. Hawley Products Co., 7 Cir., 182 F.2d 945 cited by defendant, deals with such a different factual situation that it does not apply. The defense of laches is not sustained.

I come now to the principal issue of the case—the proper construction of the plaintiff's patent. The claims in suit here provide for a coil and drum cracking process with clean circulation including reflux return by pump. There is in none of these claims, any express designation of a locus of cracking. If the claims are to be read by themselves—without reference to the disclosure of the specification—they do not specify any locus and might be broad enough to embrace either cracking in the coil, cracking in the drum, or cracking in both. Plaintiff contends that the claims must be given this broad construction and that, so construed, defendant infringes.

 It is elementary that the specification and claims of a patent constitute a contract between the United States and the patentee and they should be read and construed together, not for the purpose of limiting, contracting or expanding the claims, but for the purpose of ascertaining from the entire agreement the actual intent of the parties. The scope of every patent is limited to the invention described in the claims read in the light of the specification. Claims must be construed in the light of the specification and may never transcend the actual invention. Snow v. Lake Shore R. Co., 1887, 121 U.S. 617, 7 S.Ct. 1343, 30 L.Ed. 1004; Westinghouse v. Boyden Power Brake Co., 1898, 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136; State Bank of Chicago v. Hillman's, 7 Cir., 1910, 180 F. 732; Kennicott Co. v. Holt Ice & Cold Storage Co., 7 Cir., 1915, 230 F. 157; Burroughs Adding Machine Co. v. Felt & Tarrant Mfg. Co., 7 Cir., 1917, 243 F. 861; Benoit v. Wadley Co., 7 Cir., 1932, 54 F.2d 1041; Corn Products Refining Co. v. Penick & Ford Ltd., Inc., 7 Cir., 1932, 63 F.2d 26; Weil Pump Co. v. Chicago Pump Co., 7 Cir., 1934, 74 F.2d 13; Charles Peckat Manufacturing Company v. Jacobs, 7 Cir., 1949, 178 F.2d 794.

Plaintiff's position is that the claims should be read in the light of the specification where necessary in order to make them intelligible, but that this does not justify reading the claims as covering only the "specific embodiment" given in the specification; that the disclosure in Behimer's specification of a coil heating, drum cracking operation was only a "specific embodiment" of the general cracking operation set out in the claims. Defendant's answer is that the disclosure in the Behimer specification is not a "specific embodiment" of a general invention but it is the general invention itself, namely, the separation of the heating from the cracking zone. Defendant stresses Snow v. Lake Shore, etc., Railway, 121 U.S. 617, 7 S.Ct. 1343, 30 L.Ed. 1004, where there was a specific embodiment, i. e., a steam driven bell ringer for locomotives and also a disclosure that the detachment of the piston from the piston rod was the gist of the invention; in the defendant's structure, the two were not detached: plaintiff argued that the detachment was merely preferable, not essential, and that the claim should not be limited to the structure of the specification; that the first claim did not call for the detachment of the

rod and piston and that claim therefore read on defendant's connected structure. Nevertheless, the Supreme Court read the detachment into the claim because it was the gist of the invention and thus limited, the claim was held to be not infringed; the court said, 121 U.S. at page 630, 7 S.Ct. at page 1351:

> "And when we compare the device as described in the specifications of the patent sued on with that of the patent of 1854, in which it was necessary to use stuffing-boxes, and consider that one of the express objects expected to be accomplished by the improvement contained in the patent of 1872 was to prevent leakage of water or steam without resort to stuffing-boxes, the conclusion seems unavoidable that the patentee intended the detachment of the piston from its rod as an essential part of the combination to be covered by the first claim."

Plaintiff cites Tilghman v. Proctor, 1880, 102 U.S. 707, 26 L.Ed. 279; Continental Paper Bag Co. v. Eastern Paper Bag Co., 1908, 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122; Smith v. Snow, 1935, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721; Permo, Inc., v. Hudson Ross, Inc., 7 Cir., 1950, 179 F.2d 386; Lewyt Corp. v. Health-Mor, Inc., 7 Cir., 181 F.2d 855; Graver Tank Mfg. Co., Inc., v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097. These cases, in my opinion, are distinguishable from the case at bar. In Tilghman v. Proctor, 102 U.S. 707, 26 L. Ed. 279, Tilghman was the inventor of the basic chemical processes of making fatty acids and glycerin from fatty bodies by effecting the decomposition of fats under the action of heat and pressure in the presence of water; he also disclosed in his specification an apparatus for carrying out that process; the defendant used a different apparatus but appropriated the basic chemical process; the Supreme Court held that Tilghman claim should not be restricted to his specific apparatus, but that any apparatus which served to carry out the basic process would be an infringement. The case might be in point were Behimer, like Tilghman, the inven-

tor of the basic time-and-temperature-induced cracking process; but that process was old and well-known before Behimer; so also was the very apparatus—coil, drum, dephlegmator and condenser—which Behimer mentioned in his specification, so nothing new remained for him but to specify certain cracking steps—coil heating and drum cracking—in that already known apparatus. In Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 122, the court held valid and infringed a patent on a paper bag machine, overruling the contention of defendant that defendant did not infringe because of differences between its machine and the machine specifically described in the specification of the patent. The court pointed out that the invention is not confined to the specific disclosure of the patent; otherwise most patents would be of little worth; also that there must be a description of the invention and the mode of putting it to practical use, but that the claims measure the invention. The court contrasted the situation there with that in Snow v. Lake Shore, etc. Railway Co., 121 U.S. 617, 7 S.Ct. 1343, 30 L.Ed. 1004, where, in the specific embodiment (i. e., a steam driven bell ringer for locomotives) the detachment of the piston from the piston rod was the gist of the invention, and held that there was nothing here to show that the specific embodiment was intended to be the gist of this invention. In Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721, the advance—the "broad conception"—was in the moving air incubator of the patent over the still air incubator of the prior art; as an auxiliary feature of refinement, the specification also mentioned that the air current should pass first to the eggs of more advanced incubation; in the accused incubator, the initially introduced air did not follow this route and the claims were silent on the point; the Supreme Court refused to restrict the claims to this precise detail of the specification because it was not the gist of the invention; the court said, 294 U.S. at page 12, 55 S.Ct. at page 283: "* * * while the specifications and drawings show a particular arrangement of the eggs and

a particular direction of the current, nowhere, in the specifications or claim, is it stated either that the direction of the current is material or, what is the equivalent, that the order in which it reaches the eggs is material." Behimer's patent does not state that whether the oil is cracked in the coil or in the drum is immaterial; on the contrary, he teaches that the sequence of the heating and cracking steps is vital; he calls coil heating and drum cracking his "broad conception" and contrasts its benefits in solving the carbon problem with the substantial carbon formations of the destructive character which have proved such an impediment in prior systems. In Permo, Inc., v. Hudson Ross, Inc., 7 Cir., 1950, 179 F.2d 386, the court held that on the issue of validity, specification limitations could not be implied in a broad claim, thus saving it from prior art references. In Lewyt Corp. v. Health-Mor, Inc., 7 Cir., 1950, 181 F.2d 855, the specification did not say that the embodiment described was what solved the theretofore unsolved problem of the prior art; the immaterial details of construction were held not to be a limitation on the invention. Plaintiff stresses Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 855, 94 L.Ed. 1097, particularly the statement of Mr. Justice Jackson that if literal infringement appears, "that is the end of it." It seems to me that this statement, taken in its context, does not have this broad meaning, as is plainly indicated by the reference to Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136, cited in support of the doctrine that "where a device is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement." Moreover, Mr. Justice Jackson further states, 339 U.S. at page 609, 70 S.Ct. at page 856, that equivalency "must be determined against the context of the patent, the prior art, and the particular circumstances of

the case." Thus tested, it seems to me that coil cracking cannot possibly be held to be equivalent of coil heating and drum cracking.

In the specification of the patent in suit, Behimer again and again discloses that the primary purpose of his invention is to solve the previously existing carbon problem and that he solves this by separating the heating zone from the cracking zone, so that the oil to be cracked, is in the heating zone only a short time and under such circumstances that there will be no substantial cracking therein. The oil leaves the heating zone at the point of incipient cracking; it is deposited in the enlarged cracking zone (unheated or lightly heated) where it remains a comparatively long space of time, so that cracking takes place there, and the carbon formed there is comparatively harmless:

> p. 1, ll. 17–29: "It is a broad novel feature of the herein disclosed process that substantially all of the cracking operation occurs in a vessel to which no external heat is applied, except at such times and in such quantities as are necessary to compensate for heat losses, the oil prior to its introduction to such vessel having been subjected to a high degree of cracking heat. * * As a consequence, I avoid substantial carbon formations of the destructive character which have proved such an impediment to prior systems."

> p. 1, ll. 38–46: "The oil to be treated on entering this circuit is subjected to a high degree of heat, but the time element is so controlled with respect thereto that there is comparatively little decomposition and deposition of carbon while it is exposed to this external heat, the oil being rapidly removed from the heating zone and conducted to the cracking zone * * *"

> p. 1, ll. 65–72: "Thus, although the oil is subjected to cracking heats in the heating zone, this temperature is attained only just previous to the exit of the oil therefrom, and therefore, the oil leaves the heating coil before any sub-

stantial decomposition and incident deposition of carbon takes place."

p. 1, ll. 72–86: "Subsequently, the highly heated oil in a state of incipient decomposition, is delivered to the cracking zone, where the desired temperature and the pressure conditions are continuously sustained and the cracking of the oil and the incident decomposition (*deposition*) of carbon are effected."

p. 2, ll. 32–34: "* * * since I conduct substantially all of the cracking in a vessel to which either no external heat is applied or only a small quantity of heat is applied. * * *"

■ This language seems to indicate that Behimer conceived his invention as prohibiting any substantial cracking in the coil and that coil heating and drum cracking was not only a specific embodiment of the general invention, but was the invention itself. Plaintiff, it is true, contends that the specification does disclose a teaching of cracking in the coil because of the temperature range revealed (p. 3, ll. 120, 121): "* * * with a temperature in the coil 1 of from 700° F. to 950° F. is ordinarily used," which temperature of 950° would involve some cracking (approximately 4% per pass) in the coil. I agree with the master that the use of this temperature (at the top of the range) would not—in view of the language of the rest of the specification —disclose to "the man skilled in the art" that Behimer taught cracking in the coil. It is my opinion that the claims in suit read according to their wording in the light of the disclosure of the specification, imply a locus of cracking in the drum; that the claims not only do not embrace cracking in the coil but that they forbid it.

Plaintiff argues that its construction of the claims in suit (to include cracking either in the coil or drum) is supported by the doctrine of "claim differentiation." The patent in suit contains 44 claims; in most of these claims, the locus of cracking is specifically designated as the drum; in the 5 claims in suit, no locus of cracking is specifically designated. Plaintiff contends that the omission of any limitation as to locus of cracking from the claims in suit clearly appears as an intentional omission, in view of the incorporation of such a limitation in other claims; that, in construing the claims in suit, effect should be given to the "striking and obviously intended contrast with other claims". Smith v. Snow, 294 U.S. 1, 14, 55 S.Ct. 279, 284.

■ The essence of the doctrine of "claim differentiation" is that a patentee is entitled both to narrow claims particularly directed to the preferred embodiment, and, to broad claims which define the invention without reference to the details of the disclosure; that in such case, the presence of the narrow claims negatives the limiting (by implication) of the broader claims; that the presence of an express limitation in one claim negatives an intent similarly to limit by implication a claim in which the limitation is not expressed; that the spelling out of the specific limitation in one or more claims gives special significance to the absence of such a specific limitation in another claim, because under such circumstances the attention of the applicant and the Patent Office is shown to have been directed to the limitation or to its absence, and the intent is clear that when the limitation was intended it was expressed. Plaintiff argues that the patent in suit has: *narrow* claims (*e.g.* Claim 43, among others) particularly directed to the preferred embodiment and including an explicit limitation as to locus of cracking, and *broad* claims (*e.g.* 12, 22, 36, 39 and 40, the claims in suit) which do not include any limitation as to the locus of cracking; that, therefore, the unequivocal spelling out of a locus of cracking, both as to where it shall and where it shall not take place (as in Claim 43) gives special significance to the absence of any locus of cracking in the claims in suit, and shows that the intent of Behimer and the Patent Office was that the claims in suit should contain no limitation as to locus of cracking. Defendant contends that the doctrine of claim differentiation has a qualification that the accused operation must be properly or fairly comprehended under "the invention" and that the doctrine does not apply to cases (such as defendant contends to be the

case at bar) where the accused operation is not properly or fairly comprehended under the invention, but is "antithetical" to the invention. Plaintiff replies that the end of all construction should be to determine the intent expressed in the claim, and that the absence of an explicit limitation —which is always an indication of intent to omit the limitation—becomes an even stronger expression of intent, if the limitation is expressed in other claims.

■ I have examined the numerous cases cited by counsel. My conclusion therefrom is that the broad claims in suit, with no specific limitations to a locus of cracking—and with other claims in suit specifying a cracking locus in the drum—would be entitled to be construed broadly as including cracking in the coil, if such broad construction were consistent with the invention as disclosed by the specification, but that the claims in suit cannot be so read if such broad construction were inconsistent with the invention disclosed in the specification, and were indeed antithetical to it. Snow v. Lake Shore, etc., Railway Co., 1887, 121 U.S. 617, 7 S.Ct. 1343, 30 L.Ed. 1004; Smith v. Snow, 1935, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721; Lamson Consolidated Stores Service Co. v. Hillman, 7 Cir., 1902, 123 F. 416; State Bank of Chicago v. Hillman's, 7 Cir., 1910, 180 F. 732; Kennicott Co. v. Holt Ice & Cold Storage Co., 7 Cir., 1915, 230 F. 157; Burroughs Adding Machine Co. v. Felt & Tarrant Mfg. Co., 7 Cir., 1917, 243 F. 861; Benoit v. Wadley Co., 7 Cir., 1932, 54 F.2d 1041; Weil Pump Co. v. Chicago Pump Co., 7 Cir., 1934, 74 F.2d 13. The application here of this principle seems to me clear; in view of the language in the specification (hereinabove quoted) a broad construction of the claims in suit to include coil cracking—is not only, not disclosed in the invention of the specification, but is there disclosed as something transcending the invention, indeed opposed to it; therefore, in my opinion the doctrine of "claim differentiation" does not sustain plaintiff's construction.

Plaintiff argues that its broad construction of the claims is supported by the issuance of the four patents, particularly the "postponed cracking" patent. From the Behimer Patent Application, Serial No. 263,562 of November 21, 1918, four patents ultimately issued, as above noted; the "starting up patent" 1,585,496, reissue 16,877; the "apparatus patent" 1,840,012; the patent in suit 1,883,850; and the "postponed cracking patent" 2,027,014. Plaintiff argues that under the Patent Office rule 41, two or more "independent inventions" cannot be claimed in a single application and that, by allowing the divisional applications, (which ultimately resulted in the granting of four patents) the Patent Office recognized that there were four independent inventions disclosed in Behimer's specification; that the specifications of the four patents are substantially identical and that it is only by their claims that the four patents may be distinguished. Plaintiff concludes that the Patent Office had in mind that there were separate independently patentable features or inventions disclosed, and that the Patent Office intended by the grant of the patent in suit to Behimer to grant protection of an invention which was independent of "postponed cracking" (claims to which were being prosecuted in the original application and on which patent 2,027,014 ultimately issued.) Plaintiff also argues that, in view of the issuance of four separate patents, predicated upon the Patent Office belief that there were four different inventions disclosed in the Behimer specifications, defendant errs in its repeated references to "the invention" of the Behimer specification,—an informed administrative body having decided that there are at least four inventions to be found there.

As to the argument of plaintiff that a "line of demarcation" was observed in the Patent Office between the two conceptions of "postponed cracking" and "clean circulation", the master made detailed Findings of Fact as to the history in the Patent Office on this point. As the master noted, the same claims were shifted back and forth from the parent application (so-called "postponed cracking") to the divisional application (so-called "clean circulation"); for example, what eventually became claim 13 of the patent which issued on the parent application, first appears as claim 41 in

Amendment "C," December 27, 1922; by Amendment "G" April 10, 1923, it was withdrawn from the parent application and transferred to the divisional application; there it remained for several years until 1932 when on July 9, 1932 Amendment "M" was filed to the parent application. This amendment contained claim No. 90, the above claim renumbered, same having been that day transferred from the divisional application. Likewise, what eventually became claim 12 of the patent in suit first appears as claim 42 in Amendment "C", December 27, 1922. By Amendment "G", April 10, 1923, it was withdrawn from the parent application, became claim 15 of the divisional application (later renumbered 14, later as revised renumbered 51, finally number 12 of the patent in suit.) Plaintiff answers that when the divisional application was filed, all claims which included return of a condensate to the heating coil were transferred from the parent application to the divisional application; that the claims retained in the parent application were all limited to "postponed cracking;" that among the claims transferred to the divisional application was claim 41 of the parent application, comprising postponed cracking and return of condensate, and claim 42 of the parent application comprising return of condensate but not postponed cracking; that in the parent application were claims to postponed cracking *per se* and in the divisional application were claims to return of condensate with or without postponed cracking. Plaintiff points out that (in the 9 year interval between the divisional application in 1923 and the final submission of claims on July 17, 1932): 17 claims were added to the parent application, all dealing with postponed cracking; 8 claims were added to the divisional application, all including a step of return reflux. Plaintiff explains the re-transfer from the divisional application to the parent application of the claims in Amendment "M" by the fact that in Interference No. 49,355, Behimer by his disclaimer to Dubbs, had given up the claim of "clean circulation without substantial vaporization in the coil," and in Interference No. 55,610, Dubbs, by his disclaimer to Behimer, had given up the claim of "clean circulation with mechanical return of reflux;" that Behimer thereafter limited all claims in the divisional application to "clean circulation with a forced mechanical return of reflux" and transferred back to the parent application claims limited to postponed cracking broadly, with a general statement as to return of reflux whether by gravity or mechanical means. The Patent Office, on August 2, 1933, had rejected the remaining claims of Behimer on the ground that the process consisted in heating in the coil and cracking in the drum, and did not differ patentably from the earlier Trumble Patent, No. 1,281,844, issued on October 15, 1918. Thereafter, Texas, as assignee of Behimer, filed an action in the Supreme Court of the District of Columbia, entitled Texas v. Coe, for the purpose of compelling Coe (who was the Commissioner of Patents) to issue the patent with the claims that had been refused by the Patent Office. The court ultimately decided in favor of Texas and ordered the patent to issue; it was issued on January 7, 1936, as Patent No. 2,027,014, the "postponed cracking." patent.

The master gave due consideration to what he called the "tortuous and involved record of parent and divisional applications, amendments and transfers," in an effort to determine whether that record and the subsequent issuance of the "postponed cracking" patent on January 7, 1936 (over 3 years after the date of the patent in suit) indicate a "line of demarcation" observed in the Patent Office between the concepts of "postponed cracking" and "clean circulation" that should affect the construction of the claims in suit read in the light of the specification. He concluded that, on the record here, the issuance of the four patents, and particularly the "postponed cracking" patent, does not indicate that the Patent Office observed a line of demarcation between the two concepts of "postponed cracking" and "clean circulation", and does not require or warrant that the claims in suit should be given plaintiff's broad construction. The master's conclusion is supported by the record; I approve it.

In support of its contention that the claims in suit should have a limitation as to locus of cracking implied into them, defendant has introduced in evidence the file wrapper of the parent Behimer application Ser. No. 263,562 which, down to the date of the filing of the divisional application that matured as the patent in suit (April 6, 1923) contains the history of the prosecution of the original disclosure; the file wrapper of the divisional application Ser. No. 630,242, which is the divisional application that matured as the patent in suit; the file wrapper of Interference No. 49,355, which involved claims from the divisional application Ser. No. 630,242, none of which is included in the patent in suit; the file wrapper of Interference No. 55,610, which involved claims from the divisional application Ser. No. 630,242, from one of which came Claim 22 of the patent in suit, which is a claim in suit here; various excerpts from Interference No. 49,654, which involved claims from the parent application directed to the postponed cracking feature or invention; various excerpts from Interference No. 49,655, which involved claims from the parent application directed to the postponed cracking feature or invention; various excerpts from Interference No. 49,656, which involved claims from the parent application directed to the postponed cracking feature of invention; various excerpts from Interference No. 52,543, which involved claims from the parent application directed to the postponed cracking feature; and excerpts from the R.S. 4915, 35 U.S.C.A. § 63, action, Texas v. Coe, supra, which involved claims from the parent application directed to the postponed cracking feature or invention. This evidence shows that Behimer (and plaintiff) repeatedly took positions opposite to those taken here, with respect to the disclosure of the Behimer specification, in the following respects (among others): interpreted the process of the Behimer specification as a coil heating, drum cracking process which solved the carbon problem by preventing cracking in the coil, thereby removing the cause of carbon formation; interpreted the Behimer process as permitting no substantial cracking in the coil; analyzed the original Behimer specification as clearly teaching heating in the coil without substantial cracking; repeatedly distinguished coil cracking processes such as Dubbs (not the '629 Patent) and Trumble, from Behimer's invention because they dealt with the carbon problem by limiting the cracking in the processes and by sweeping the carbon from the coil with velocity, whereas Behimer solved the carbon problem by avoiding its cause, namely, cracking in the coil; recognized that the vaporization occurring in a coil cracking operation after pressure release into a drum is not the vaporization occurring in Behimer's drum where a substantial body of oil is maintained and vaporization results from cracking; recognized that the step of returning reflux to the inlet of the coil was a mere auxiliary refinement in the basic coil heating, drum cracking steps; recognized the lack of equivalency between cracking in the coil, and heating in the coil and cracking in the drum as in Behimer, by distinguishing other disclosures and references on that ground; recognized that the Behimer process employed a flow of oil whereby the cracking temperature is reached only at the time the oil emerges from the coil at the hottest part of the furnace, as contrasted with the opposite flow in coil cracking processes. Defendant urges that any statements made in the course of the Patent Office proceedings, regardless of the issue being discussed and regardless of whether the statements were made with reference to efforts to secure protection of the postponed cracking feature, should be construed as admissions affecting the construction of the claims in suit. Plaintiff replies that, among the many alleged admissions as to "the Behimer invention" in the Patent Office proceedings, defendant has not made reference to a single instance in which Behimer or The Texas Company was discussing the claims in suit; that the only portions of the Patent Office history which can shed light upon the intended meaning of the claims in suit is that portion dealing with the claims in suit. There has also been introduced in evidence a Behimer Patent No. 1,923,526, dated August 22, 1933, the so-called Behimer "Coil Cracking Patent", in the specification whereof Behimer repeatedly indicates that in his application for this

patent (filed August 13, 1925) he has found out for the first time, how to crack oil in the heating coil without causing undue deposits of carbon therein.

Plaintiff contends that the patent in suit, like any other written document, is to be construed according to the four corners of the instrument and that, therefore, none of the excerpts is admissible on construction; that *a fortiori,* the excerpts from Interference 49,654, Interference 49,655, Interference 49,656, Interference 52,543 and 4915 action, Texas v. Coe are inadmissible because they relate to proceedings in the Patent Office and elsewhere after the filing on April 6, 1923 of divisional application 630,242 from which evolved the patent in suit. Defendant's position is that the construction of the claims in suit here is to be had in the light of the disclosure of the patent specification; that that patent specification is substantially the same specification involved in all of the above interferences and in the 4915 proceeding and forming the basis of the patents thereon as issued, and that the language of Behimer's disclosure cannot now have a meaning antithetical to the meaning which Behimer and the Texas Company gave to substantially the same language in these antecedent proceedings.

My understanding of the law on this issue is this. If the claims, read in the light of the specification, are clear and unambiguous, then the antecedent declarations of the applicant should be regarded as merged in the patent as ultimately issued—that being the contract between the United States and the patentee—and these declarations should have no relevancy to alter or impair that clear unambiguous construction. If, however, the claims, as issued, are not clear and unambiguous, then under the doctrine of Goodyear Dental Vulcanite Co. v. Davis, 102 U.S. 222, 26 L.Ed. 149, the antecedent statements of the applicant would be relevant for the purpose of clearing up this ambiguity; particularly so where they would constitute "declarations against interest." As above stated, I find no ambiguity in the claims in suit here and regard the language thereof (considering the whole patent, claims and specifications) as clearly and unambiguously limiting cracking to the drum. However, if the language of the claims themselves, were to be regarded as so ambiguous that it could not be told therefrom whether cracking was limited to the drum or whether cracking was permissible in any zone—then, in my opinion, the proceedings of Behimer in the Patent Office (particularly in connection with his application for the patent in suit) would be admissible for the purpose of explaining this ambiguity; and if admissible for such purpose, they would unquestionably show that Behimer conceived his invention as embracing cracking in the drum alone. Moreover, as cited above, the construction urged by plaintiff for the claims in suit is contrary to the disclosure of the specification. Plaintiff supports his construction by the introduction of extraneous matter, among other things, the "postponed cracking patent"; in my opinion the admissions and conduct in question of Behimer in the Patent Office are also admissible, to refute the construction sought to be put upon the invention and the claims by plaintiff; they corroborate the view heretofore reached (from the language of the patent itself) that cracking in the coil is not impliedly embraced in the claims in suit.

Since about 1930, there has been widespread use of coil cracking processes embodying the step of returning reflux to the coil inlet. From this widespread use plaintiff argues that its patent and the claims in suit should be given liberal, *i. e.* a broad construction and cites Eibel Process Co. v. Minnesota & Ontario Paper Co., 1923, 261 U.S. 45, 63, 43 S.Ct. 322, 67 L.Ed. 523; Smith v. Snow, 1935, 294 U.S. 1, 14, 55 S.Ct. 279, 79 L.Ed. 721; Hunt v. Armour & Co., 7 Cir., 1950, 185 F.2d 722. This general proposition is good law, but it is applicable only to cases where the commercial success can be fairly regarded as attributable to the invention. The issue here is whether Behimer's claims in suit are to be construed (as defendant contends) as to heating in the coil and cracking in the drum, or (as plaintiff contends) as to cracking either in coil or drum. For plaintiff to argue in support of its construction (cracking in any

locus) that immediately after the issuance of the patent in suit there had been widespread use and success of a coil cracking process—is begging the question; to regard commercial success of a coil cracking process as an element in construing Behimer's invention to include coil cracking, would require an initial assumption that the Behimer invention did include coil cracking, otherwise instances of coil cracking use and success would not be referable to the Behimer invention. If Behimer failed to suggest that a coil cracking process was within the area of his invention and if he failed to teach the use of the quenching step and the low liquid level operations (which together with many other factors not embraced by the Behimer patent have made the modern coil cracking process successful), then the success of such a coil cracking practice would have no bearing on the construction or scope of the Behimer patent. The master concluded that it is not permissible to prove A by assuming B to be correct, and then to prove B by A.[3] It is begging the question to rely on the popularity of putative commercial embodiments which are like the accused device but unlike the disclosure of the patent. The case at bar involves the proper construction of the claims in suit, particularly whether they include a coil cracking process; no matter what the success of other commercial processes that comprise coil cracking, this success would not be helpful on the question of the construction of the claims in suit as to whether these claims comprise coil cracking. Such commercial success could not be invoked to change the specification of the Behimer patent nor to extend the scope of its claims. If the claims are to be construed as comprising heating in the coil and cracking in the drum, no use of the opposite process of coil cracking, however widespread, can change that construction. See Dorsey v. Pilot Electric Co., 2 Cir., 1929, 32 F.2d 211, 213; Great Atlantic & Pacific Tea Co. v. Supermarket, etc., Corp., 340 U.S. 147, 153, 71 S.Ct. 127, 95 L.Ed. 162; Aetna Ball & Roller Bearing Co. v. Standard Unit, etc., Corp., 7 Cir., 1952, 198 F.2d 222, 229.

I sum up my views on this question of the proper construction of the claims in suit as to the locus, if any, of cracking. The primary task in construing the claims in suit is to determine what the inventor conceived to be his invention—the intent as expressed by the inventor and the Patent Office in the language of the patent, both the claims and the specification. In seeking to ascertain the intended meaning, I have given primary consideration to the claims themselves, which are required by statute for the purpose of delineating the metes and bounds of the patent monopoly; to the disclosure of the specification and to its express statement that certain of the steps of the specific embodiment therein disclosed could be varied or even omitted without departing from the spirit and scope of the invention; to the fact that, whereas the claims in suit are silent as to locus of cracking, other claims spell out a locus of cracking in detail, with instructions as to where it shall be and also with instructions as to where it shall not be; to the fact that three divisional applications were filed so that patent protection might be afforded on each of four independent inventions and to the fact that four patents issued; to the accomplishments, wide use, and commercial success of clean circulation and to the authorities which recognize that claims to meritorious inventions should be liberally construed; to the Patent Office proceedings, which would be relevant only if there were some ambiguity, which ambiguity I do not find; to the doctrine that a patentee is entitled to all uses to which his invention may be put even though he may not have declared or even been aware of all those uses or methods of use, when he secures

---

3. Plaintiff's comment is: "It is likewise not permissible to disprove A (i. e., that the claims in suit, as written, have been widely used and should be accordingly construed with liberality) by assuming B (i. e., that the claims do not mean what they say on their face) to be correct, and then proving B by assuming A to be incorrect or disproved—especially so, when the law required that B depend upon A rather than that A depend upon B."

his patent. I have considered all these matters and have sought to give them such weight as, under the record here, I feel they deserve. Construction of claims—to paraphrase Justice Jackson's language as to equivalency in Graver Tank Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 "is not the prisoner of a formula and is not an absolute to be considered in a vacuum." I have carefully studied the language of the patent in suit— the specification, and all the claims both those in suit and those not in suit. After weighing all these elements—the issue is still narrowed to this: what was the nature of the Behimer invention as he conceived it and expressed it in his specification and claims? And, in my opinion, the answer clearly is: Behimer in his patent (reading the specification and claims together as I feel they must be read) expressed the nature of his invention as the separating of the heating zone from the cracking zone, thereby solving the vexatious carbon problem; and therefore it follows that the claims in suit must be construed as limited to cracking in the drum—separate from the heating zone—and cannot be construed to include cracking in the coil, such as in defendant's accused process. This conclusion reached on the record before me is fortified by the holding in Texas Co. v. Anderson-Prichard Refining Corp., 10 Cir., 1941, 122 F.2d 829—where the record, though in many ways substantially different from that in the case at bar, nevertheless presented essentially the same question of the construction of the language of the same claims here in suit.

Plaintiff also contends that the basic feature of the Behimer claims is the independent invention of "Clean circulation"—and that the locus of cracking, whether in coil or drum or both, is immaterial; that this is why no specific locus is set out in the claims in suit. Defendant's position is that there is only one basic feature in any of the claims of either the patent in suit or of the postponed cracking patent; that this feature is postponed cracking and that the locus of cracking in the drum, is essential. These conflicting contentions also involve a question of construction; what did Behimer conceive his invention to be—what do the words of the claims in suit mean, read in the light of the specification? Is cracking the important thing, with "clean circulation" an optional auxiliary step—or is "clean circulation" the important thing with cracking in the drum as an optional step? In every one of the claims in suit, the introductory sentence calls for a cracking process: 12: "A process of oil conversion"; 22: "A process of converting heavy into lighter hydrocarbons"; 36: "A process of converting heavy into lighter hydrocarbons"; 39: "A process of cracking oil"; 40: "A process of cracking oil". Nowhere, neither in the claims in suit nor the specification, was the return of reflux described as a separate and distinct step which might be employed in any oil cracking process, but throughout the specification, the return of reflux is described as an *optional* adjunct to the process of the specification. As noted, there is no ambiguity in the patent in suit but if there were, and if Behimer's proceedings in the Patent Office became relevant under Goodyear, etc., v. Davis, 102 U.S. 222, 262 L.Ed. 149, supra—then these proceedings would clearly show that Behimer had never regarded "clean circulation" as a separate invention, but had always regarded it as an auxiliary or optional addition to, or refinement of his real invention, i. e., the separating of the heating and cracking steps. It is true, that Behimer, in his specification (p. 1, l. 83) speaks about continuing the cycle, but this he says is after his process "in its broad conception" is already complete; his language seems to be susceptible of only one interpretation, namely that his invention, as he conceived it, was then complete with the coil heating and drum cracking steps, and that the further step or recycling of reflux was something that was *optional* or *preferable,* but not a necessary part of the invention. In my opinion, the claims in suit cannot be construed as showing "clean circulation" as a separate invention; Behimer, as I read the patent, never claimed such a concept.

The record discloses several other issues which I shall discuss in the sequence pre-

sented in defendant's brief; these issues, however, become unimportant (a) if I am correct in my construction of the patent claims, as involving heating only in the coil, and providing for a separate zone for cracking, and (b) if I am also correct, in holding that there is no separate invention of clean circulation. One such issue is the effect of Behimer's disclaimer. As already noted, Behimer in December, 1931 filed a disclaimer to Dubbs in Interference No. 49,355 and an order of priority to Dubbs was entered by the examiner; on the same day, Dubbs, in Interference No. 55,610 filed a disclaimer to Behimer and an order of priority was issued to Behimer by the examiner. Immediately prior to the declaration of Interference No. 49,355 and as a condition to its declaration, Behimer at the suggestion of the patent examiner[4] had copied certain Dubbs claims (clean circulation "without substantial vaporization in the coil") as a basis for the Interference but had also retained Behimer's Claim 42 (clean circulation without this limitation prohibiting substantial vaporization in the coil). Defendant's position is that on the original pre-interference notice from the examiner, it was up to Behimer, in view of the fact that his claim 42 was not literally identical with the claims of the issued Dubbs patent, to take one of two positions, either (a) that the differences were significant, refuse interference, appealing from the examiner, if necessary or (b) that the differences patentwise were immaterial, go into interference and prevail in the interference; that because Behimer elected to take position (b) and went into the interference, he thereby admitted that clean circulation (his Claim 42) and clean circulation "without substantial vaporization in the coil," are patentwise the same. Plaintiff's position is that since Behimer did not cancel, but retained Claim 42, merely adding the Dubbs claims, that Behimer thereby made it clear that he was not acquiescing in the identity of Claim 42

with the Dubbs claims, but was asserting rights to both and that he regarded clean circulation generally (his Claim 42) and clean circulation "without substantial vaporization in the coil" (the Dubbs claims) —as essentially different. Defendant argues further that by the Behimer-Dubbs disclaimer, No. 49355, Behimer had disclaimed or abandoned clean circulation generally; that under and subsequent to the Dubbs-Behimer disclaimer in No. 55610, Behimer had narrowed his claims to clean circulation "with a pump" (the added element of a pump being then considered patentable) and had accepted a patent with the element of the pump as the carrying clause; that the effect was that Behimer conceded that these claims were distinguishable from the prior art only by this feature of forced mechanical return; that since it is now conceded that the pump contributes nothing patentable to the combination without the pump, there is, therefore, in Behimer, no general invention or patent of clean circulation; that in substance, the broad concept of clean circulation therefore became prior art. (It is apparently conceded in the record here by both parties that—contrary to the view of the patent office at that time—the element of the pump is not a patentable novelty). Defendant restates this by saying that even if Behimer be conceded to be the first inventor of clean circulation, even if clean circulation generally be conceded to have been patentable, nevertheless, Behimer, by his deliberate act, gave this away and secured in the claims in suit, only claims on a pump—which claims to be held valid, must be considered as though they had been limited to postponed cracking; that by the disclaimer Behimer elected not only to give up the claims which the patent office ruled could be in only one patent, but also forever to bar himself from urging that the novelty of such claims as he received, should be judged by the prior art in reality; that he elected to give away "clean cir-

---

4. "The examiner's action was based on the authority of Ex parte Card and Card, 112 O.G. 499, 1904 C.D. 383, holding that in spite of differences in the rival claims, if the real invention claimed is the same, the applicant can secure a patent only by proving priority of invention in the regular way, i. e. by winning an interference.

culation" as a patentable conception, and to have the novelty of his patent claims judged as though Dubbs were prior to him. Plaintiff's reply is that Behimer's disclaimer was a mere election "not to claim" a given patent claim, i. e. clean circulation "without substantial vaporization in the coil"; that this cannot be transformed into a concession that plaintiff's other claims here in suit, in a subsequent infringement action like this, should be judged not by the prior art as it actually was, but by some "synthetic prior art". Defendant's argument is based on the premise that clean circulation generally (Behimer's original Claim 42) and clean circulation "without substantial vaporization in the coil" (the Dubbs '629 patent) are essentially the same; that the step limitation in Dubbs "without substantial vaporization in the coil" is an immaterial difference. It is a fact that in Texas Co. v. Anderson-Prichard Refining Corp., 10 Cir., 122 F.2d 829, supra, on p. 837, the court so held. This, however, is in contrast with defendant's position in Universal Oil Products Co. v. Globe Oil & Refining Co., D.C., 40 F.Supp. 575, where defendant in an infringement suit on the '629 Dubbs patent successfully defended on the ground that it, defendant, had substantial vaporization in its coil, contrary to the Dubbs claim in suit prohibiting substantial vaporization in the coils. Affirmed, Universal Oil Products Co. v. Globe Oil & Refining Co., 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399.

Defendant relies on Maytag Company v. Hurley Machine Co., 1939, 307 U.S. 243, 59 S.Ct. 857, 83 L.Ed. 1264. That case came before the Supreme Court on a conflict between the Courts of Appeals of the 2d and 8th Circuits as to the validity of apparatus Claims 23, 26 and 29 of the Snyder patent No. 1,886,779; the claims having been held invalid in the 2d Circuit and valid in the 8th Circuit. The Supreme Court stated, 307 U.S. at page 244, 59 S.Ct. at page 858: "We need not resolve the conflict, since we are of opinion the patent is void for failure to disclaim claim 39." The patent issued July 12, 1932 to the Maytag Company, as assignee, contains 39 claims, 36 of which are for an apparatus (washing machine) and three of which, 1, 38 and 39 for a method (a method of washing fabrics). In 1935 the company obtained a decree in a suit against the Brooklyn Edison Company for infringement of apparatus claims 23 and 26 and method claim 38, Maytag Co. v. Brooklyn Edison Co., D.C., 11 F.Supp. 743; the Circuit Court of Appeals for the 2d Circuit reversed as to all three claims, holding that they did not disclose novelty. 86 F.2d 625. The Supreme Court refused certiorari, 300 U.S. 662, 57 S.Ct. 493, 81 L.Ed. 870, and the company promptly disclaimed two of the method claims, 1 and 38, but did not disclaim the third method claim 39. In the instant cases, infringement of apparatus claims 23, 26 and 29 was charged but method claim 39 was not in suit nor had it been made the basis of any other suit. The court cited and applied R.S. 4917 and R.S. 4922, 35 U.S.C.A. §§ 65, 71, providing that the claims must be disclaimed promptly unless the claims are definitely distinguishable from the parts claimed without right; and held that there had been unreasonable neglect or delay within the meaning of the Statute in entering a disclaimer of claim 39 unless that claim is definitely distinguishable from the parts claimed without right, that is the disclaimed method claims 1 and 38. The court in a footnote, 307 U.S. at page 246, 59 S.Ct. at page 859, compared claims 38 and 39 and concluded that the claims described but a single method, overruling the company's point that a crucial difference lies in the fact that in 38 the moving fluid in the tub is said substantially to suspend the fabrics, whereas in 39, the same agency is said to cause the fabrics to be freely moved about. The court points out: "But the difference in verbiage describes no difference in operation or result"; concluding that they described the same method; and that, therefore, the entire patent, including the apparatus claims in suit, was invalid. Plaintiff argues that there are important differences between a patent office disclaimer—such as occurred here—Behimer to Dubbs, and a Statutory Disclaimer, such as existed in

the Maytag case and that because thereof the holding of the Maytag case is not here applicable.

In Foxboro Company v. Taylor Instrument Company, 2 Cir., 1946, 157 F.2d 226, certiorari denied 1947, 329 U.S. 800, 67 S. Ct. 494, 91 L.Ed. 684, decided after the Maytag case, the Circuit Court of Appeals for the 2d Circuit (opinion by Judge Learned Hand) considered a like situation, where the patentees had disclaimed several claims and retained two. One of the claims retained was distinguishable from one of the claims disclaimed, only by a single element; the defense was made that this claim was invalid since invention would not be required to add the single element to the disclaimed claim. The court discussed the argument and the decision in the Maytag case and said in part, 157 F.2d at pages 227–228:

"* * * If the language quoted from Maytag Co. v. Hurley Machine Co., supra, be read literally, this argument would not be without force; but a number of courts—beginning with Judge Archbald's decision in Manhattan General Construction Company v. Helios-Upton Co., C.C.1905, 135 F. 785, 802—have decided that a disclaimer should not be taken as an admission by the patentee that the disclaimed matter was not patentable; and we do not believe that the Supreme Court intended to overrule this doctrine. The consequence of so holding would be indeed severe, for it would result, whenever the patentee made any disclaimer, that he risked his whole patent except in so far as his remaining claims were patentably distinguishable from those disclaimed. In United Chromium, Inc., v. International Silver Co., supra [2 Cir.], 60 F. 2d [913] at pages 914, 915, we stated our reasons for thinking that by dis-

claimer a patentee does not so concede."

In my opinion, the Maytag case is not applicable here; and the correct rule to be applied is that re-stated in Foxboro v. Taylor Instrument, supra. See also, Reed v. Cropp Concrete Machinery Co., 7 Cir., 1916, 239 F. 869; Standard Scale & Supply Co. v. Cropp Concrete Machinery Co., 7 Cir., 1919, 256 F. 666. Behimer, by his election to go into Interference No. 49,355, and by his election to acquiesce in the Examiner's rejection of certain of his claims (including Claim 42) on the issue of the interference, did not abandon clean circulation generally and did not become precluded from thereafter denying that said Interference involved the broad issue of clean circulation, regardless of the differences in language between his claims and the claims of Dubbs. Further, it is my conclusion that Behimer by his disclaimer in Interference No. 49,355, and by the amendment of his claims (following their rejection) by the addition of the now concededly non-patentable element of pump return of reflux, did not abandon clean circulation generally, did not concede that the prior art included clean circulation generally, did not in his invention concede that the only patentable novelty was the pump, did not invalidate the patent if given plaintiff's construction. Behimer's claims in suit are to be construed and judged on the prior art, as it actually was.[5]

In this connection, defendant argues that the public interest was grossly disserved when two patents issued, one (Dubbs) for clean circulation, limited to without substantial vaporization in the heating coil, but unlimited as to the means for returning the reflux from the dephlegmator to the coil inlet, and the other (Behimer) with no limitation as to the physical state of the oil in the coil—with or without sub-

5. Defendant cites Stewart v. Nathanson and Nathanson, 341 Ill.App. 217, 93 N. E.2d 154, on the doctrine of election. Plaintiff there joined lessors of premises (used for tavern) with lessee in an action for damages under Dram Shop Act; he later dismissed action as to les-

sors; still later, he proceeded in rem against the premises (under section 15 of the act) to enforce the lien of his judgment against the lessee; it was held that the dismissal of the lessors did not constitute an election and did not bar him. I see no application here.

stantial vaporization, but limited to a pump for reflux return. Defendant charges that Texas' conduct constituted "unclean hands", barring it from any relief in a court of equity; that this agreement was a violation of the spirit of the patent law; that it helped create a monopoly, that it enabled the previously issued Dubbs patent to be extended for a further period of 17 years. The master found that the agreement between Universal and Texas was a reasonable and proper compromise of protracted and costly law suits that had already gone on for a long time and were likely to continue for many years; that the compromise was motivated by the desire of both parties to avoid further expense and delay; that such a compromise of complex and doubtful litigation is favored in law; that the monopoly of the Dubbs patent No. 1,392,629 was not extended by the monopoly of the Behimer patent in suit, because the claims of the Dubbs patent differed in material and important respects from the claims of the patent in suit, and plaintiff has never owned the monopoly of the Dubbs patent directly or indirectly. I concur in these holdings.

Defendant contends that under the rule in the seventh circuit, the validity of Behimer's claims must be judged wholly by the element added by amendment following upon their rejection. Defendant concludes that since Behimer's claims had been rejected on the issue of Interference No. 49,355 and (to avoid the rejection) Behimer had amended his claims to add the element of pump return of reflux—that the patentability must rest on this added element of pump return of reflux—this element at that time having been regarded by the Patent Office as patentable, but now being conceded by the parties hereto to be unpatentable; that it is a rule of patent construction that a claim, in a patent as allowed, must be read and interpreted with reference to claims that have been cancelled or rejected, and that the claim allowed cannot by construction be read to cover what was thus eliminated from the patent; that all of Behimer's allowed claims with the pump (regardless of the time when the allowance was obtained) must therefore be construed in the light of rejected claim 42

without the pump. Plaintiff's position is that Behimer's claims—including 42 of the parent application, not limited to forced return of reflux—were rejected by the Patent Office not as unpatentable over the prior art, but as unpatentable over the issue of Interference No. 49,355; that patentability must rest, not on the ground that may happen to be assigned by the Patent Office as an administrative tribunal, but on the real invention, and that since "clean circulation generally" was not embraced in the prior art at that time, that "clean circulation generally" cannot be regarded as prior art in determining Behimer's novelty. Plaintiff argues that a court of equity cannot lend its approval to such an ignoring of reality and such a violation of justice, as this "synthetic prior art" contended for by defendant, would here produce.

Stromberg Motor Devices Co. v. Zenith Carburetor Co., 7 Cir., 1918, 254 F. 68 seems applicable. One of the patents involved in that case was an Ahara patent on a carburetor; the defendant there relied upon the acquiescence in the rejection of a broad claim in the Patent Office. The Circuit Court of Appeals held all claims in suit of the Ahara patent valid and infringed. The court summarized the pertinent portions of the file wrapper; after repeated rejection of claims on the prior art, the examiner had allowed 7 claims and rejected claim 1 of the application; an effort was made to secure allowance of this claim by further amendment, but it was again rejected. The court, 254 F. at page 77 said: "It then became obligatory upon the solicitor to decide whether he would appeal or close the application by taking out the patent with the previously allowed claims as sufficient protection of the disclosed invention." The applicant cancelled claim 1 of his application. It should be observed that (on defendant's theory here) applicant in so cancelling, admitted that the cancelled claim was not patentable and predicated patentability on the differences between the allowed claims and the cancelled claim. However, the court held to the contrary, saying, 254 F. at page 77:

"Beyond question the owner of the Ahara patent has no standing to sue

upon canceled claim 1 or to seek a construction of an allowed claim that would have the effect of reviving the canceled claim. But that, in our judgment, is the extent of the estoppel. The solicitor's subsequent election not to appeal from the rejection of claim 1 can be given no retroactive effect upon the negotiations leading up to the allowance of the claims in the patent so as to narrow those claims to less than they were entitled to at the time of their allowance. In those negotiations the solicitor always and consistently declared that claim 1 of the patent, for example, produced a new result, through a new mode of operation, by means of a new mechanical combination, and never for a moment conceded that the inventive concept in that claim amounted to nothing but adding to abandoned claim 1 (not then in existence or abandoned) means for controlling the communication between the reservoir and the auxiliary well. On his side the examiner receded from his original position, and allowed the claims in the patent without stating or demanding any limitation or condition not inherent in the claims themselves, or furnishing any contemporaneous glossary for their interpretation. In electing not to appeal from the rejection of claim 1 the solicitor did not agree that the examiner's action was correct; much less that an infringer should take abandoned claim 1, and not the prior art itself, as the measure of invention involved in the patent."

In Ethyl Gasoline Corporation v. Coe, 1943, 78 U.S.App.D.C. 233, 139 F.2d 372 the issue was raised by the failure of an applicant to copy a claim rather than by his disclaimer of it; however, the reasoning of the court is equally applicable to either situation. The contention of the commissioner of patents was, 139 F.2d at page 373: "It is well settled that where an applicant has disclaimed certain subject matter by failing to present a claim thereto which was suggested for purpose of interference, that subject matter is properly considered as prior art with respect to the applicant." The applicant failed to make a claim suggested to him and other claims were then rejected as being unpatentable over the claim which he failed to claim and thereby "disclaimed." The applicant then brought an action under R.S. 4915 to compel the commissioner to issue a patent. The trial court refused a patent and sustained the commissioner; the Court of Appeals reversed. This court's opinion referred to the position of the commissioner quoted above and to findings of the trial court in accordance with the commissioner's ruling; its opinion continued, 139 F.2d at page 373: "This, we think, goes too far. Whatever may be the effect of the rules adopted by the Patent Office, whatever may be the merits of the present claims, it is obvious that 'the prior art' cannot include facts unknown to the prior art before the application was filed. * * *" The court concluded its opinion with a warning as to "arbitrary and capricious" application of Patent Office rules, stating, 139 F.2d at page 374 that this was "the ever-present danger of rules of thumb which are designed to achieve convenience by avoiding the exercise of administrative discretion." International Cellu-Cotton Products Co. v. Sterilek Co., Inc., 2 Cir., 1938, 94 F.2d 10 and W. S. Godwin Co. v. International Steel Tie Co., 6 Cir., 1924, 2 F.2d 198, 199 are to the same effect.

Defendant, however, while recognizing that the rule is otherwise in other circuits, insists that in this Seventh Circuit the validity of Behimer's claims must be judged wholly by the element added by amendment following upon their rejection—namely the unpatentable pump. Defendant admitting that the Stromberg case, supra, is against its position, cites two later cases from this circuit, Electroline Co. v. Reliable Electric Co., 7 Cir., 1938, 101 F.2d 380 and National Pressure Cooker Co. v. Aluminum Goods Mfg. Co., 7 Cir., 1947, 162 F.2d 26. These cases contain language in accord with defendant's contention. The Electroline case was a patent infringement case; the lower court dismissed; the appeals court affirmed, holding the patent invalid for want of invention. The court held that where a com-

bination which related to a device for connecting electrical conductors and did not have thickened walls, was denied a patent by the Commissioner of Patents, the Circuit Court of Appeals could not rule differently in a suit for a subsequently granted patent for such a device. The court stated that it was unfair to say that the district court had assumed that the invention was predicated solely upon an element added by amendment and further observed, 101 F.2d at page 383: "The patent was predicated upon the entire amended combination, and we think the District Court so considered it." National Pressure was a patent infringement suit, wherein a judgment for plaintiff was reversed because the claims in suit were held invalid on account of lack of invention; the court, after reviewing the history of the proceeding in the Patent Office, stated there was some confusion in the authorities as to the importance which may properly be attached to an amendment by which the allowance of a patent has been secured, and quoted from the Electroline case, 101 F.2d at page 382. The court concluded 162 F.2d at page 31: "In any event, the manner in which allowance of these claims was procured seriously impairs the presumption of validity which ordinarily attaches to the grant. Of course, the circumstances are not conclusive against validity but we think they are persuasive." In neither of these opinions, does the court make any reference to the Stromberg case, supra; defendant argues that this case is overruled *sub silentio.* The master ruled against defendant and held that the patentability of Behimer's claims should be judged upon the entire combination of the claims.

■ I have some doubt as to the proper rule. However, absent an unequivocal mandate from the Appeals Court of this Circuit overruling the Stromberg case, I am reluctant to adopt defendant's position which seems to me (with due deference to his authorities) to be harsh, artificial and at variance with the realities. In my opinion, the law should not and does not, require that the novelty of Behimer's invention be judged on the basis alone of the added element of the pump.

Another issue is as to the date of Behimer's invention. In an attempt to avoid the effect of two prior art disclosures relied on by defendant, Manley 1,462,143 and Alexander 1,407,619 (filed respectively on October 10, 1917 and November 30, 1917), plaintiff contends that Behimer's date of invention is "early in 1916." Two grounds are advanced: first, that Behimer made an actual reduction to practice in May and June, 1917, and second, that Behimer conceived his invention prior to Manley and Alexander and made a constructive reduction to practice by filing his patent application with reasonable diligence. The invention was conceived by Behimer while in the employ of Texas and was disclosed by him to others of Texas in late summer and early fall in 1916. Experimental apparatus for carrying it into effect was designed in the latter part of 1916 and constructed at Port Arthur, Texas, during the early part of 1917.

During May and June, 1917, Behimer conducted in this experimental apparatus at Port Arthur, certain continuous operations, designated as Runs 6, 7, 8 and 9 of Experiment 8, Coil and Drum, which employed the general process and in each of which (according to plaintiff's evidence): a gas oil charging stock was fed to a heating coil where it was heated to a cracking temperature; the oil was discharged into an insulated drum where separation of vapors from residuum took place; the residuum was withdrawn from the drum and discharged from the system; the vapors were passed from the drum to a dephlegmator where they were partially cooled, forming reflux; the uncondensed vapors containing gasoline were passed to a condenser; and the reflux from the dephlegmator was returned to a jet pump at the inlet of the coil where it was mixed with the charge and forced under mechanical pressure through the coil; superatmospheric pressure was maintained upon the system. Gasoline was produced in each of these operations, which are recorded in various contemporary documents produced in evidence. The yield of gasoline, when determined on the basis of a comparatively low end point of 390° F. averaged 22%;

it was at least 16.66% in Run 6; 31% in Run 7; 21.71% in Run 8; and 18.54% in Run 9. In these runs, the unit was under cracking conditions for periods as long as 41 hours in Run 6 and 39 hours in Run 9; in no case was the operation halted because of carbon trouble; there were difficulties in operation, but these were due to deficiencies in equipment and not to the process. One problem which Behimer sought to overcome was that of the excess production and accumulation of light kerosene-like fractions in a cracking process for making gasoline from a gas oil charge; in these runs this was successfully accomplished. The master found that in these runs, there was conducted a unitary pressure cracking operation for the production of gasoline from gas oil which did not produce more of undesirable kerosene-like fractions than were consumed within the operation itself.

 The law does not require that an invention be embodied in a commercial form in order to effect a reduction to practice thereof; nor does the law require that a reduction to practice attain a degree of perfection secured in the later history of the art. Hildreth v. Mastoras, 1921, 257 U.S. 27, 34, 42 S.Ct. 20, 66 L.Ed. 112; Pierson v. Beck, 1930, 40 F.2d 769, 770, 17 C.C.P.A., Patents, 1210. Defendant criticizes experiment 8 as a reduction to practice because it did not improve upon the prior art in length of run, or in gasoline yield, or in dealing with the carbon problem; defendant also criticizes the experiment because (it says) that there is no satisfactory evidence the jet pump worked. There are in the record, expressions of dissatisfaction by Behimer as to the extent or degree with which these runs solved the carbon problem. Behimer's superiors at Texas, in commenting on the results, stated that the experiment will undoubtedly give satisfactory results if properly arranged and constructed of suitable material; that the continuous tube process shows great promise, but owing to difficulties in getting the proper equipment in this apparatus, no satisfactory run has yet been made on it. The master found that these statements, both written and verbal, merely show that

the operation had not attained the perfection (or possibly the commercial success) that Behimer in his pride of invention was seeking for it and that he hoped would be attained (and that the record shows was later attained) with improved apparatus and equipment; but that these statements do not show that the process was not operable or not regarded as operable by Texas.

 When defendant was sued for infringement of Dubbs '629 patent, Universal Oil Products Co. v. Globe, Oil & Refining Co., D.C., 40 F.Supp. 575, 580, 581, defendant asserted Behimer's priority over Dubbs and contended there that Behimer's coil and drum experiment 8 constituted a reduction to practice. Defendant, on the record there, was not able to sustain this defense. Defendant now, when being sued on the Behimer patent, takes the position that coil and drum experiment 8 did not constitute a reduction to practice. Defendant's objections to treating Runs 6, 7, 8 and 9 of the coil and drum experiment 8 as a reduction to practice, are based upon the testimony of its witness Robert W. Leslie. Leslie testified in the present case in 1947, 30 years after the experiment in question; he was not present at any of the runs and, so far as the record shows, has never at any time seen the equipment and apparatus with which the runs were conducted. His only knowledge of the runs is from the evidence, both testimony and exhibits, as to the conditions of the runs, how they were conducted and what results they produced. He criticized the runs on the ground that they did not embody the teachings of the patent in suit because: 1. there was not sufficient velocity to prevent local overheating and segregation of the vapor from the liquid. 2. the cracking was not all done in the drum save for incipient cracking. 3. the kerosene fractions were not re-cycled until they were converted to gasoline. 4. a drum of ample volume compared to the volume of the heating coil was not employed. 5. the runs did not secure yields comparable to existing processes, let alone improve upon them. 6. reflux was not returned at all times under direct applied mechanical pressure (he gave as his opinion, that the jet

pump used by Behimer would not produce sufficient head to overcome the friction in the furnace; that the rate of charge at times was so low that the jet would not pump). Before the jet pump was installed in the apparatus used in coil and drum experiment 8, it was tested several times; first it was tested with water by Witherup in the machine shop where it had been made (Behimer testified as to this test); then the jet pump was brought over to the shed where the experiment 8 was conducted and another test was made of it, using water (Earnest testified as to this test); finally, the jet pump was tested with oil, using Marsh pumps which were to be used in experiment 8. (Behimer testified as to this and Earnest testified in detail and made drawings illustrating the apparatus used). A record was kept of these tests and was introduced here; the master found that the tests showed that the jet pump would and did work; that it picked up as much as a 30″ head of oil. The report devotes 10 pages to a detailed consideration of Leslie's criticisms. The master concludes that these criticisms, as to the success of Runs 6, 7, 8 and 9 of experiment 8, Coil and Drum, and particularly as to the operativeness of the jet pump— are based upon erroneous assumptions, speculations and calculations and are not well founded in the record here; that the operations conducted by Behimer during May and June of 1917 in Runs 6, 7, 8 and 9 of Experiment 8, Coil and Drum, demonstrated utility in his coil and drum cracking process; that in these runs, mechanical pressure was applied by the incoming charge to the reflux entering the coil through the medium of the jet pump which was operative for this purpose. The record presents a sharp dispute on these points. After a careful examination of the findings, the objections, the evidence and the briefs, I am unable to say that the preponderance is with plaintiff; if I were the trier of facts, there are some of these matters on which my findings might be different from those of the report. However, under the rules, the master's findings are to be accepted unless clearly erroneous; his findings certainly have substantial support in the record and are not clearly erroneous. I confirm them.

Sometime after completion of the runs on Experiment 8, Coil and Drum, designs were prepared for the construction of a larger semi-commercial plant (designated High Pressure Coil Still Exp. No. 8) to remedy the deficiencies of the experiment; work on this project continued until January 3, 1918 when the work stopped; the unit was never built. This left a gap between January 3, 1918 and November 21, 1918—when the patent application was filed. Defendant contends that plaintiff by delaying the filing of the application until 16 months after the actual reduction to practice and 10 months after the stoppage of the above work, showed a lack of proper diligence. Meanwhile, and after June 1917, Manley (of Texas Company) had filed application on October 10, 1917 for the patent that ultimately issued No. 1,462,-143, July 17, 1923; and Alexander had filed application on November 20, 1917 for the patent that ultimately issued No. 1,-407,619, February 21, 1922. R. C. Holmes, who was then Vice-President of Texas, was one of the original joint applicants in the Behimer application as finally filed. The first draft of the patent application was prepared shortly after December 13, 1917; a second draft was prepared in January, 1918, in the name of Holmes alone; a third draft was prepared in February, 1918 before W. T. Donaldson (a lawyer in the patent department of Texas, who was in charge of the matter) left for the army. All of these drafts of application were prepared by Donaldson in close contact with Behimer. After Donaldson went into the army, K. G. Mackenzie (an officer of Texas) took charge of the filing of the patent application; Mackenzie was not a lawyer but attempted to handle the remaining details in the absence of Donaldson during the war. Donaldson had suggested (letter January 22, 1918) that Behimer should be joined as an applicant with Holmes in this and other patent applications; the re-written applications (in the names of Holmes, Manley and Behimer) were forwarded by Manley in Houston to Holmes in New York on February 20, 1918. The applica-

tion along with certain other applications was turned over by Holmes to Mackenzie with instructions to have it transmitted to a patent attorney and put in shape for filing. Following the customary procedure in the organization, the application was sent by Mackenzie to Nesbitt in the legal department on March 22, 1918. Nesbitt, however, was sick and Mackenzie so advised Holmes (then in Florida) on March 23. As appears from his letter of March 22, to Nesbitt, Mackenzie proposed to be in Houston in the coming April and to take up the applications there. On May 3, 1918 Mackenzie reported to Nesbitt that he called on Coit (Texas' Washington patent counsel) and had left the applications, including the one involved here, with Coit for study, and that he proposed to return to Washington to confer further with Coit about the matter. There were further conferences and finally Coit on July 22, 1918 reported to Nesbitt that it was all right to file the cases under consideration, and this was in turn reported by Nesbitt to Holmes on July 23. Mackenzie points out that this was in the crucial period of World War I; that he was very busy with war matters with which he had become involved as a result of relationship with various officials of the company who had important war duties, and that this necessarily took considerable of his time; that on August 27, 1918 he reported to Holmes his suggestions concerning further revision of the application. Mackenzie again conferred with Coit in Washington on Saturday, September 7, 1918 and on September 9, wrote Holmes a report in which he says that Coit was to make certain changes in the application involved here in view of their conference. On September 11, Coit in Washington forwarded the revised application to plaintiff's legal department by which it was transmitted to Mackenzie on September 13. Manley came to New York and executed the application papers on October 1, 1918. The application was then forwarded to Holmes for signature and to Port Arthur for signature by Behimer. Behimer had some comments to make which he wrote to Mackenzie in his letter of October 31 and Mackenzie then forwarded the application to Holmes to be again reviewed and on its return to Mackenzie, he forwarded it through the legal department to Coit for filing. On November 21, 1918, it was filed in the Patent Office.

 Defendant contends that subsequent to Experiment 8, neither Texas nor Behimer exercised diligence in the filing of the patent application; that the 16 month delay was too long, under the rule in W. F. & John Barnes Co. v. International Harvester Co., D.C.N.D.Ill.E.D.1943, 51 F. Supp. 254. The master held that under the circumstances, particularly the uncertainties and confusion attendant in the participation of the United States in World War I, the plaintiff showed "reasonable diligence" and that this was all that was required. Christie v. Seybold, 6 Cir., 1893, 55 F. 69, 76; Courson v. O'Connor, 7 Cir., 1915, 227 F. 890, 894; Uihlein v. General Electric Co., 7 Cir., 1931, 47 F.2d 997, 1000. The master held that original Behimer application Serial No. 263,562, as filed on November 21, 1918, was a constructive reduction to practice of the invention of the claims here in issue; that Behimer's priority over Manley and Alexander is established on the ground that Behimer made an actual reduction to practice in May and June, 1917, prior to the earliest dates shown for Manley and Alexander, thus establishing Behimer as the prior inventor; that Behimer's priority over Manley and Alexander is established also by the fact that Behimer conceived his invention prior to Manley and Alexander, and made a constructive reduction to practice by using reasonable diligence in filing his patent application. In my opinion, the diligence required was not "extraordinary" diligence, but "reasonable" diligence. I concur in the master's holdings.

 A large part of the record is concerned with the defense that the claims in suit—if they should be construed as broad enough to cover defendant's operation—are anticipated by the prior art and, therefore, invalid. The law on this issue seems clear. The burden of proof is on defendant; Radio Corporation of America v. Radio Engineering Laboratories, Inc.,

1934, 293 U.S. 1, 54 S.Ct. 752, 78 L.Ed. 1453, Mumm v. Jacob E. Decker & Sons, 1937, 301 U.S. 168, 171, 57 S.Ct. 675, 81 L.Ed. 983; National Slug Rejectors v. A. B. T. Mfg. Corp., 7 Cir., 1947, 164 F.2d 333. In evaluating the prior art, it is to be considered from the standpoint of the men in the art at the time the invention was made, and may not be reconstructed in the light of the present day knowledge; National Slug Rejectors, Inc. v. A. B. T. Mfg. Corporation, 7 Cir., 1947, 164 F.2d 333. In considering the bearing of the patents and publications cited as prior art or anticipation, the basic question is what does the cited reference itself say—not what it might have said or what might be done with it by a present day expert, adding present day knowledge. Young Radiator Company v. Modine Mfg. Co., 7 Cir., 1931, 55 F.2d 545. When, as here, a process invention is involved, it is the process which must be anticipated; it is not sufficient to find in the prior art a disclosure of apparatus in which the process might be conducted. Carnegie Steel Co. v. Cambria Iron Company, 1902, 185 U.S. 403, 424, 22 S.Ct. 698, 46 L.Ed. 968, City of Milwaukee v. Activated Sludge, Inc., 7 Cir., 1934, 69 F.2d 577, certiorari denied 293 U.S. 576, 55 S.Ct. 87, 79 L.Ed. 673.

The principal art asserted by defendant is grouped into the "drum cracking" art and the "coil cracking" art; in addition, defendant introduced a number of patents which are relied upon for incidental features of operation, either alone or in connection with other art. The drum cracking art was brought forward partly in an effort to show the antiquity of certain basic principles of cracking, and partly in an effort to develop certain asserted analogies with the operation of the Behimer patent in suit. Dr. Clarence K. Reiman testified as expert for defendant thereon, and introduced a chart to illustrate this "drum cracking" art, from which he contended Behimer derived. Dr. Reiman also introduced a chart showing "coil cracking" either in the coil alone or in both coil and drum, and as tending to show that defendant's operation stems therefrom. The prior art knew of batch processes and continuous processes; Burton was the chief proponent of the batch process; the continuous processes were exemplified in the Hall Patents—Haddon (Benton) British No. 1922 of 1887, in the Rittman operation at Oil City in 1916 to 1923, and in the de Florez 1916–1917 operations at Bayonne. Such processes were not cyclic—possibly because of their not using any pump capable of handling hot reflux. The batch cracking operations, such as Burton's, were necessarily carried on in a drum or tank, whereas continuous cracking processes very generally employed a coil at the cracking zone. In all these cracking processes, whether continuous or batch, coil or drum, or both coil and drum, provisions had to be made for separating the vapors of the desired product, (whether kerosene or gasoline) from the vapors of the heavier material inevitably carried with them, and for returning the latter (either immediately while still hot, or on a subsequent occasion) to the cracking zone for re-treatment. The separating operation was accomplished by fractionating the vapors, resulting from the cracking operation, that is, by condensing all save those of the desired product; this was done by a device or equipment variously known as "a partial condenser," "a fractionater," "a dephlegmator;" a modern example thereof is the "bubble tower." After having been condensed, the condensate was then subjected to further cracking. Defendant at the trial referred to the following patents in the prior art as illustrating what its expert terms "drum cracking processes:" Atwood, No. 28,448, May 29, 1860, Merrill, Reissue No. 7096, patent No. 100,-915, March 15, 1870, Dewar and Redwood, No. 419,931, January 21, 1890, Burton No. 1,049,667, January 7, 1913, Burton, No. 1,-105,961, August 4, 1914, Humphreys, No. 1,119,700, December 1, 1914, Manley, No. 1,462,143, July 17, 1923, application filed October 10, 1917. The Atwood and Merrill patents describe atmospheric pressure processes for the production of kerosene; the Dewar and Redwood patent describes a process using low superatmospheric pressures, and appears to be for the production of kerosene. Each of these processes is a batch distillation process using heavy residual oils, as a charging stock; these processes were not intended for, nor would they

be suitable for, the production of gasoline. The two Burton patents, No. 1,049,667 (granted January 7, 1913, on application filed July 3, 1912) and No. 1,105,961 (granted August 4, 1914, on application filed August 25, 1913, renewed May 25, 1914) and the Humphreys patent No. 1,119,700 (granted December 1, 1914 on application filed June 26, 1914) show essentially the same type of cracking operation for the production of gasoline, which is sometimes referred to in the record here as the "Burton type." In each, a body of oil is heated in a directly fired still, which is maintained under pressure, the resulting vapors passing off through one or more ascending vapor lines in which some cooling takes place and the resulting condensate flowing downward and dropping into the body of liquid in the still, as in the "dropping back" processes in the kerosene cracking art. The three patents describe batch operations in which the unvaporized oil, with its accumulating cracked residual matter, is retained in the still to the end of the operation. The Humphreys patent describes essentially the same process as the Burton process, except that here two lengthened vapor lines are employed with the deliberate purpose of condensing the heavier fractions of the vapors from the still and returning them for further treatment; Humphreys uses two vapor lines with a control valve because of variations in rate of flow of vapors in different periods of the operation. As noted, defendant in its presentation before the master, attempted to show a derivation of its process from the coil cracking processes of the art prior to Behimer; in an effort to distinguish further from Behimer, he also attempted to classify the Behimer process with the drum cracking processes of the prior art (based largely upon the use of the term "drum" in the Behimer patent to describe one element of the apparatus).

Following his discussion of the "drum cracking" art and his classification of the Behimer process within that art, Dr. Reiman, as defendant's expert, turned to a group of prior art patents which he designated as "coil art."

Some of these patents were alleged to describe cracking processes for the production of kerosene; others, cracking processes for the production of gasoline. It is from among this group of patents that defendant professed to find the genealogy of its own cracking process, as presented in the chart. Others of this group of patents were cited by defendant for their alleged bearing upon individual features of the Behimer process or equipment or to supplement other patents in various respects. In its briefs before me, defendant has apparently receded from this approach and has confined its discussion of the prior art to seven patents, as follows: Trumble No. 1, 281,884; Manley No. 1,462,-143; Alexander No. 1,407,619; Ellis. No. 1,396,999; Hall No. 1,175,910; Pielsticker No. 477,153; Pielsticker British No. 1308 (of 1891).

Trumble patent No. 1,281,844 (issued October 15, 1918, on application filed June 19, 1915) describes a "dirty circulation" process in which tars and residues are recirculated to the heating coil. The patent is vague and indefinite as to the nature of the material under treatment, the temperatures and pressures to be used and products to be made; the process described is not a satisfactory one for production of gasoline; in it, at best, there could be secured only mild cracking, as for example, reducing the viscosity of heavy oil to make it more suitable as a fuel oil. The Thompson surge pump was developed for use in connection with the practice of the Trumble process and successfully handled hot oil (i. e. oil having a temperature as high as 750° F.) in that process. The process as practiced, never became a cracking process for making gasoline. In drawing this conclusion on the record here, I am not unmindful of Skelly Oil Co. v. Universal Oil Products Co., 3 Cir., 1929, 31 F.2d 427 where the Trumble patent was held valid and not anticipated and claims 2 and 4 were held infringed.

Manley patent No. 1,462,143 was issued July 17, 1923 on application filed October 10, 1917. It discloses a continuous and cyclic process for the cracking of "kerosene, gas oil, lubricating oil and the like" (p. 1, ll. 13–14) to produce gasoline, by means of a directly fired cracking still containing a body of oil under pressure. A

charge oil is introduced through an injector nozzle into a condensate return pipe whereby return condensate in admixture with the charge oil is forced (p. 1, 1. 45) into the bottom of a vertical, small diameter cylindrical still; the oil "forms an extended vertical column"; the still is in the furnace and is provided with a bottom draw-off pipe for removing residue from the system (p. 2, ll. 125–127). The still is heated intermediate its ends, extending beyond the furnace at its bottom and top; the level of the oil in the still is being carried at a high point above the furnace, as indicated by the gauge (p. 1, ll. 104–6); feed is supplied to the bottom of the still and residue is withdrawn from the bottom of the still; the operating conditions mentioned in patent are a temperature of from 650° to 800° F. for the hydrocarbon in the cracking still and a pressure of 100 to 300 pounds in the apparatus (p. 2, ll. 50–57): the vertical still contains a scraping device to aid in keeping its inner surface clean: the vapors from the top of the still pass through a vapor line to a separator or air condenser in which the constituents of the vapors, less volatile than the gasoline or naphtha vapors, are condensed and are returned through the pipe to the bottom of cracking still (p. 2, ll. 64–69): the return of this recycle is a forced return by reason of the injector effect of the charge oil admixed therewith in the pipe (p. 1, ll. 90–95; p. 2, ll. 70–72). Manley does not disclose a heating coil through which oil is fed and in which the oil is heated to a cracking temperature; he does not disclose the return of reflux to the coil in a coil and drum cracking operation. Inasmuch as the Manley process is basically one in which the liquid oil to be cracked is maintained in a directly fired still (the heat being applied directly to the liquid oil) the process remains subject to those disadvantages common to such processes of cracking, in that all of the heating is done in the one still which contains all of the tarry residual material in the system. Defendant asserts that the Manley equipment could be made to resemble Behimer's equipment merely by including a heating coil for the combined reflux and fresh feed and discharging the oil from the heating coil into the bottom of the cracking drum; this, however, would completely change the Manley process and there is in the prior art no suggestion of such a change in a process like that of Manley.[6]

Alexander patent No. 1,407,619 was issued February 21, 1922, on application filed November 30, 1917; Alexander discloses a vapor phase cracking process for making gasoline; he shows recirculation of oil that includes certain reflux constituents and suggests that this might be effected by a pump. There are 8 figures in the patent drawings and 8 different processes disclosed; defendant primarily relies on process of Figure 8 and the attendant description in the specification (p. 6, ll. 42 to 100). Defendant has prepared a drawing showing the process of Fig. 8; the various elements have been rearranged somewhat so as to coincide with certain elements appearing on a flap that has been attached to the drawing; the drawing with the flap in the raised position shows the apparatus of Fig. 8 of the patent; with the flap in the down position, the drawing shows the Fig. 8 apparatus modified as suggested on p. 6, ll. 98–100 of the patent. With reference to Fig. 8 and the defendant's modification with flap down, there is provided a vaporizer which may take the form of a preheating tube 75 in a furnace, a tubular cracking furnace 113, a pair of exchanger towers or dephlegmators 110 and 117 arranged in series, and a final condenser 119 for liquefying the gasoline product. In accordance with the process disclosed on p. 6, ll. 42 to 100 and elsewhere, a charge oil ("such as crude petroleum and petroleum residue and distillates such as gas oil, solar oil, kerosene" pat. p. 1, ll. 15–17) may be pumped through pipe 111 to the upper portion of the first dephlegmator 110 where it contacts the hot vaporous material introduced from the cracking tubes 113. A heavy residuum which comprises the heavy material resulting from

6. There is another reason why Manley is not prior art as against Behimer. If I am correct in my holding above about Behimer's date of invention being June 1917, the Manley application, filed October 10, 1917, was subsequent to Behimer.

the cracking process and the unvaporized portion of the charge stock is withdrawn from the bottom portion of the first dephlegmator through line 114 to storage. Combined vapors including charge oil vapors escape from the top of the first dephlegmator through pipe 116 to the bottom of the second dephlegmator 117; the temperature of the second dephlegmator is controlled so that gasoline and lighter vapors will pass over into the condenser 119 and so that a heavier stock will be condensed; the latter is withdrawn from the bottom of the second dephlegmator. This hot condensate is a mixture of distilled fresh charge and cracked recycle stock and the mixture is used as the charge stock for the tubular vaporizer 75. Vapors from the vaporizer 75 pass through the cracking tubes 113 in a furnace maintained at 450° to 700° C. (842°–1292° F.) and are discharged into the first dephlegmator 110 as above described. The patent suggests (p. 5, ll. 62–64) that a pump 80—Fig. 5—may be used in a recycling operation; the pump shown in Fig. 5 does not in the operation of that figure, recycle a distilled stock; a line for immediate return of recycled stock is shown and described in Fig. 8 of the patent. There is a sharp dispute between the respective experts as to the amount of residual products carried over into the second dephlegmator 117 of the apparatus of Figure 8 of the patent and, therefore, as to the cleanliness of Alexander's recycled stock. Plaintiff contends that the Alexander process was inoperable and introduced evidence to that effect as to an Alexander unit operated early in 1918 at the Port Arthur plant. Defendant contends that the evidence on this point is not sufficient to show that the process of Fig. 8 of the Alexander patent was even attempted; that Alexander (Fig. 8) discloses a process wherein cracking occurs in a coil, the cracked products are quenched with a fresh charge stock, heavy residuum is withdrawn from the system, clean recycle stock is pumped to the cracking zone and gasoline is produced; that if the operation at Port Arthur was not commercially successful,

the failure of the unit must be attributed solely to equipment deficiencies, such as faulty furnace construction, failure of automatic regulators and leaky tubes.

The master found that the Alexander operation was a vapor phase cracking operation in which the oil is cracked in vapor phase under very low pressure or even under sub-atmospheric pressure; that in the operation of Alexander, tar and coke formed in the cracked vapors would be carried into the second or fractionating tower as well as into the first or exchanger tower; that the liquid collected in the second tower would not be a satisfactory stock for coil heating or cracking; that the Alexander patent does not disclose a process operative for recycling of any product formed within the system; that the Alexander process has been for many years abandoned as a commercial operation; that this abandonment was due to its inefficiency of operation, its high gas losses and the severe limitations upon the character of oil which could be used as charging stock. These findings have ample support in the record; I approve them.[7]

Ellis patent No. 1,396,999, issued November 15, 1921 on application filed October 4, 1913, is directed "to a process of making gasoline from heavier oils, such as kerosene and the like" (p. 1, ll. 9–11). It discloses: tube cracking under pressure, withdrawal of heavier oils, and return of intermediate (kerosene) fractions to the decomposing tubes. A hydrocarbon oil, such as kerosene, is introduced through a feed pipe into cracking tubes positioned in a furnace heated to 400° to 600° C. (752°–1112° F.); the oil is passed from the tubes through an enlarged digester to a dephlegmator or fractionating column "which preferably is of a type used in the rectification of alcohol and the like" (p. 1, ll. 104–106). A light distillate which includes the desired gasoline is discharged from the top of the column 10 for further treatment; the kerosene and heavier oils are separately withdrawn from the dephlegmator through pipes; the kerosene fractions—the cleanest

---

7. Alexander was issued on an application filed November 30, 1917; therefore, like Manley, it is subsequent to Behimer if Behimer's date of invention is June, 1917.

of the various side streams that may be withdrawn are "returned to the decomposing tubes": the process may be carried out under pressure of several atmospheres. Plaintiff contends that the Ellis patent is not a good reference because it is a "paper patent" and because the disclosed process is inoperative; defendant admits that, so far as the record in this case is concerned, the process specifically disclosed in the Ellis patent was not operated on a commercial scale. Dr. Reiman testified that a vapor phase cracking process of the character disclosed in the Ellis patent (using no catalyst in the cracking tubes) is operable without excessive deposition of carbon in either the cracking tubes or the digester; his testimony was based on observation made of experimental units run in the 1920's at A. D. Little, Inc., in Cambridge, Massachusetts and at Tiverton, Rhode Island. Plaintiff attacks these conclusions by charging that certain separators and other elements were installed in these two units to prevent coking. The tube furnance and digester of the Cambridge unit were closely comparable to those disclosed in Ellis, the substantial difference being that a separator was originally installed in Cambridge between the vaporizing section and the cracking section of the heating tubes. Dr. Reiman testified that he personally removed the separator after the unit had been in operation a short time. The separators between the vaporizing sections and the cracking sections of the heating tubes in the Tiverton unit remained in place during the operation of that unit; and tar pots were interposed between the digestors and the following columns and were used in the Tiverton operations. The specification says, (p. 2, ll. 8 to 14): "Preferably, however, the kerosene is separated from the heavier oils and the former (*kerosene*) returned to the decomposing tubes while the latter (*heavier oils*) which is preferably separated as a fraction similar to gas oil (*and would contain residue*) is collected and suitable disposition is made thereof." Plaintiff charges that Ellis does not show recycling because there is no showing of a recycle line in the patent drawings. (Ellis shows pipe 11a or 11b

for the withdrawal of kerosene and says that kerosene is preferably "returned to the decomposing tubes"); defendant answers it would be within the province of one skilled in the art to provide a pipe for the return of kerosene and to employ a hot oil pump for the purpose if one were required and available. In determining the operability of Ellis, an issue of fact arose between the parties as to the type of fractionating system taught by him. The patent points out (p. 1, l. 104, p. 2, l. 2): "From the digester the vapors may go to a dephlegmator or fractionating column which preferably is of a type used in the rectification of alcohol and the like in place of the ordinary coarse dephlegmator used in the present day rectification of oil." Defendant argues that Ellis contemplated and disclosed a dephlegmator having a lower vapor space into which the vapors from the digester were discharged and in which "the heavier oils," including any residue and carbon formed, were collected. Dr. Brooks (the expert for plaintiff) testified that Ellis' fractionating column could only be one in which bubble trays were spaced throughout from the bottom to the top and that this would not work. The operations of A. D. Little, Inc. at Cambridge, Massachusetts, and at Tiverton, Rhode Island, conducted in apparatus designed by Luis de Florez, contained equipment for handling and separating coke and tar formed in the process; this equipment has no counterpart in the Ellis patent and was developed long subsequent to Behimer's filing date; that these operations might have been carried on for some period of time would not, therefore, establish the operativeness of the Ellis process.

The master concluded that Ellis was not prior art because: 1. he does not recognize the difficulties arising from coke formation or offer any solution for them. 2. he does not teach a recycling operation for he discloses neither the direct return of reflux nor its return while hot during the operation. 3. the digester and fractionating column disclosed by Ellis would rapidly coke up and are inoperative. These conclusions

are well supported by the record; I approve them.[8]

Hall patent No. 1,175,910 [9] (issued March 24, 1916 on application filed January 23, 1915) describes a vapor phase cracking operation conducted at low pressures; the cracking of the oil is effected in vapor phase in a coil; the cracked vapors from the coil pass successively through the two dephlegmators in which the pressure is 10 pounds per square inch or less. In the first dephlegmator, the temperature is reduced to about 325° C. (617° F.) this being the temperature at the top of the dephlegmator; in the second dephlegmator, the temperature of the vapors is reduced to 180° C. (356° F.) which temperature is likewise that at the top of dephlegmator. The material removed from the first dephlegmator is a tar or heavy residue having a specific gravity of about 1.0 or a Baume gravity of about 10°. Carbonaceous material in very finely divided form is produced in the vapors undergoing cracking in such vapor phase processes as the Hall process; Hall discloses that carbonaceous material is carried into and thrown out in large quantities in both dephlegmators. In the process of this Hall patent, the material collected and withdrawn from the second dephlegmator, designated by him as "light residue," is not suitable for use as a charging stock for the process without redistillation to remove heavy ends and carbonaceous material. Plaintiff's objections to disclosure of the Hall patent are: 1. the main feature of Hall's process resides in the succeeding treatment of the final cut collected in the separator. 2. the condensate removed from the second dephlegmator is dirty and,

therefore, there is not clean circulation. 3. there is no disclosure that the re-cycled stock is immediately returned through the cracking coil. Considerable conflict exists in the record as to whether Hall discloses immediate re-circulation to the cracking coil of the "light residue" withdrawn from the second dephlegmator. The patent says that this "light residue" (p. 3, ll. 3–4) "is used as a raw material for a second run through the cracking coil 4". Defendant's position is that Hall clearly contemplated and taught a direct return of recycled stock, as indicated by p. 2, ll. 44–51 of his Patent No. 1,242,796 (which is referred to by serial number on p. 3, col. 2, l. 4 of the ('910) patent):

"the material which separates in the second cooler and trap is free from solid carbon and free from coke-like material, and this second condensate (termed "light residue") can be directly employed for making a second "run" through the apparatus, without filtration or other preliminary treatment."

The complete development of the Hall process was described in the testimony of plaintiff's expert, Luis de Florez, from the inception of the process to the final form which it took in the plant constructed at Bayonne at the expense of plaintiff under the direction of the owners of the Hall patents, to demonstrate the process and induce plaintiff to take an exclusive license under the Hall patents; at no time during the entire history of the process was it possible to take any condensate material from the dephlegmators and re-use it in the process without redistillation; even gas oil likewise required redistillation to remove its

8. Defendant has cited Standard Oil Co. v. Globe Oil & Refining Co., D.C.N.D.Ill. E.D.1934, 9 F.Supp. 89, affirmed 7 Cir., 1936, 82 F.2d 488, 491, 493. This was an action by Standard against Globe for infringement of Patent No. 1,392,584 (issued on October 4, 1921 to plaintiff as assignee of Lewis and Cooke) and No. 1,851,526 (issued on March 29, 1932 to plaintiff as assignee of Sheaffer and Brown). The trial court made a finding of fact that the use of the bubble tower on a cracking still, with return of reflux to the still "is described in the

prior art patents to Vaughan and Ellis." The court held as a conclusion of law that the "Lewis and Cooke patent is anticipated by the prior art patents to Vaughan No. 49,689, Barbet No. 536,732 and Ellis No. 1,396,999." In each opinion the references to Ellis are brief; there is no showing that the record there as to Ellis is the same as in the case at bar; indeed, the inference seems to me to be the contrary.

9. There was another Hall patent No. 1,242,796, issued October 9, 1917.

heavy ends before it could be used in the process. The use of any stocks other than light, redistilled stocks was precluded by the nature of the operation; nor could the temperatures used in the operation for cracking be reduced and still secure effective cracking. The gas losses in the operation were excessive, and, because of these losses and of the limited range of stocks which could be handled in the process, the process was not adopted in the industry. The record shows that in September and October, 1938, *inter partes* tests were conducted in McPherson, Kansas for the purpose of demonstrating the operability of the process of the Hall '910 patent. Dr. Reiman evaluated the results and compared them with the disclosure of Hall. Defendant contended that the apparatus and process conditions at McPherson conformed in all material respects to the disclosure of Hall and that the operability of McPherson proves the operability of Hall. 9 runs were made at McPherson, of which runs 1, 2, 3, 4 and 8 were claimed by defendant to demonstrate the operability of Hall. There was no substantial issue between the parties as to the operability of the McPherson experiment as a recycling operation; there was, however, a dispute as to whether the apparatus and process conditions at McPherson conformed to the Hall '910 disclosure. The master found in detail that there were substantial differences between the apparatus and process conditions at McPherson, and those disclosed in Hall; that defendant had the burden of proof to establish that the McPherson operation was so similar to Hall in conditions and apparatus and process, that the experiment's operability would demonstrate Hall's operability; that defendant did not sustain that burden. Defendant has filed objections to the Findings but has not argued the objections, so that I have treated them as abandoned.

The master found that the statement in Hall '910 Patent that the light residue "is used as raw material for a second run through the cracking coil 4" (p. 3, ll. 3 and 4) does not describe or suggest a recycling operation; that the term "run" as used in the petroleum industry, means a complete operation from start to shutdown; that the Hall Patent No. 1,242,796 describes a process which is different from the process of Hall Patent No. 1,175,910 in essential characteristics, and as to the methods of dephlegmation employed, particularly as to cracking temperatures and pressures; that the processes are the reverse of each other in their handling of the vapors leaving the cracking coil, and the characteristics ascribed to the products of the condensation or dephlegmation of these vapors in the operation of the '796 patent cannot be ascribed to those resulting from the operation of the '910 patent. In my opinion, the record shows that the material withdrawn from the second tower in Hall is not suitable for use as a charging stock for the process without redistillation to remove the heavy ends, etc. and the patent does not describe or suggest a recycling operation as against Behimer. Hall No. 1,175,910 is not prior art.[10]

Defendant contends that if the claims in suit are to be construed as readable upon defendant's accused process, then the claims in suit are invalid as anticipated by the process disclosure in British Patent 1308 of 1891 and U. S. Patent 477153 of 1892, both issued to Carl Pielsticker; these patents (according to defendant) show the antiquity of the broad steps of clean circulation and it is, therefore, proper to consider them at some length. The Pielsticker patents disclose processes for treatment of hydrocarbon oils. Dr. Reiman, as defendant's expert, described the processes of these patents and found a disclosure of cracking. To illustrate his testimony, he had prepared what he contended to be a simplified drawing of the apparatus disclosed in the Pielsticker patents; the drawing represents an integrated assembly of various figures of the British and U. S. Patents as he relates them to the major issues here under consideration. The process evolved by Dr. Rei-

10. The record shows that plaintiff granted licenses under 8 Ellis patents (including No. 1,896,999) and 9 Hall patents (including No. 1,175,910); this constituted some recognition of the utility and sufficiency of the disclosures of these patents, but in my opinion it was not conclusive.

490

man from the several disclosures of the Pielsticker patents is substantially as follows (with particular reference to British Patent 1308 in 1891): A hydrocarbon oil is pumped by pump C from a supply tank A to an elongated heating coil D positioned in a first heating furnace; the diameter of the heating coil may be graduated from 2 inches in the first section to 1 inch in the last section, in order that the oil may be passed through the coil at high velocity to prevent carbon deposition therein. The heated oil is discharged from the heating coil through inlet G to a horizontally placed drum or retort I, having a plurality of vertically extended baffle plates K which provide means for causing the oil vapors formed, to take an elongated path through the retort over and under alternate baffles. An outlet valve N is provided at the end of the retort for continuously withdrawing tar or residuum from the retort during operation. In the upper portion of the far end of the retort is provided a dome P through which hydrocarbon vapors pass to a gooseneck Q and a series of final condensers U and $U^1$. The gooseneck may be provided with a valve R to create pressure within the retort I during the operation. The dome P may take the form shown in detail on the assembly drawing and in Fig. 3 of the British patent where it comprises an enlarged base portion and an upper cylindrical portion containing a plurality of baffle plates S. A liquid reflux condensate formed in the dome P collects within a cup-shaped projection T in the base portion of the dome; this condensate may be returned directly through pipe $P^1$ to the retort I or to the supply tank where it mixes with fresh feed, or to the heating coil D (see claim 6 of the British Patent). The U. S. Patent contains a disclosure similar to the British Patent No. 1308, except that it does not disclose, as does Claim 6 of the British Patent, direct return of reflux to the coil. Defendant's position is that the Pielsticker patents teach: a) cracking of hydrocarbon oil under pressure, b) immediate clean reflux return to the coil inlet or to the supply tank, c) continuous withdrawal of residuum from the system.

Plaintiff's objections to Pielsticker as prior art may be summarized: 1. The disclosure in the British Patent is indefinite because no apparatus is specifically shown for the return of oil to the heating coil; defendant answers that the broken off pipe $P^1$ for removal of reflux could only have meant that an extension of this pipe is to be used for the returning of the oil. 2. Pielsticker does not show sufficient pressure, a pressure such as that of Behimer: defendant answers that mechanically applied pressure, i. e. a pump, as applied to the recycled stock, is within the province of the one skilled in the art and does not rise to the dignity of the invention. 3. Pielsticker does not specifically describe the character of the hydrocarbon oil subjected to treatment: defendant answers that the description, while not detailed, is just as specific as that in Behimer. 4. Pielsticker nowhere specifically describes the character of the desired product. Defendant claims Pielsticker discloses the character of products formed, as carbon, tar or residuum, selected condensates of varying specific gravities, an intermediate condensate formed in the dome which may be returned to the retort or to the supply tank for further gravity reduction, and permanent gas; that Behimer's claims are broadly drawn to a cracking process and they are in no way limited to the character of the product produced. 5. Pielsticker is directed to an apparatus for continuous distillation and no cracking is disclosed other than for the manufacture of permanent gas or very light oil; defendant concedes that the claims of both the Pielsticker patents are drawn to apparatus, but argues that there are process teachings in both the specifications and the claims which emphasize the manner in which the apparatus is to be used and that this necessarily reveals a disclosure of the cracking process; that while it is true that the Pielsticker process does not describe the degree of cracking, neither does the process of Behimer's patent in suit. 6. The Pielsticker patents are indefinite because they do not give operating conditions of temperature and pressure: defendant answers that plaintiff's claims in suit (as plaintiff would

construe them) are equally indefinite in that they are sufficiently broad to cover any cracking process, irrespective of temperature or pressure. 7. None of the Pielsticker patents has seen commercial use; defendant's answer is that there is no authority in patent law which holds that a reference to be valid as an anticipation must have been commercially used.

Defendant argues that its contention that Pielsticker discloses a cracking process is confirmed (a) by the prelitigation interpretation of the Pielsticker patents by plaintiff's expert, Dr. Brooks, and (b) by the examiner in the Patent Office. Dr. Brooks in 1937, wrote an article, "A Brief History of Petroleum Cracking," in which he stated (referring to these Pielsticker patents): "One of the most interesting of the patents of this period was that issued to Carl Pielsticker." Dr. Brooks continued by quoting Pielsticker's statement concerning the production of lighter gravity oils by the use of pressure and his instruction to use "greater velocity" to prevent carbon deposition in the coil; Dr. Brooks would not (defendant argues) have discussed these teachings of Pielsticker under such a title unless he then believed that Pielsticker taught cracking. The fact is that Pielsticker did disclose cracking in the second coil in his two-coil operation, as admitted by both parties, and hence Dr. Brooks was justified in referring to this patent in a history of cracking. His statement pointing out certain peculiarities in the passages contained in the patent may not, however, be interpreted (as defendant contends) that cracking is to be found in those passages or in other passages cited by defendant. Defendant also refers to the citation of the Pielsticker United States patent in the prosecution file of the Behimer Divisional application relating to apparatus where the Examiner stated (in part):

"Thus, in lines 106–111, page 2, Pielsticker states that, 'when it is intended to produce still lighter gravity oils, a valve b may be placed between the outlet of retort L and the condenser.' This is believed a clear reference to cracking, since in ordinary distillation

for obtaining light fractions, but without cracking, pressure is avoided."

Defendant asserts an acquiescence by Behimer in this statement, by reason of the withdrawal of the claims then under rejection. I do not agree with this conclusion: these claims related to apparatus and not to the process here involved and hence the question under consideration there, was whether the art cited by the examiner as a whole (not alone the Pielsticker patent) disclosed the apparatus. Since the issues there were essentially different from those here, it is my opinion that it would be improper to conclude from the action taken in that case that Behimer acquiesced in the examiner's position that Pielsticker disclosed a cracking process in the passage mentioned.

The master made detailed findings that: 1. The Pielsticker British patent No. 1308 of 1891 and the United States Pielsticker Patent No. 477,153 are apparatus patents for general use in the continuous distillation of oils, fats and other liquids, and also for the production of distilled water from sea water, the concentration of brine and alkaline solutions, and the concentration of sugar solutions; 2. In the Pielsticker British patent No. 1308 of 1891 and the United States Pielsticker patent, the only clear disclosure of cracking is in connection with the operation that uses a second coil in which the vapors from the retort are further heated; this is disclosed at p. 3, ll. 21–27, of the British patent and in the corresponding passage of the United States patent. This operation is conceded by defendant to have no relation to the Behimer process; except for this passage, these Pielsticker patents do not clearly disclose any cracking operation. 3. Neither the British Pielsticker nor the United States Pielsticker discloses any operation for cracking or any other purpose, in which oil is heated in a coil to a cracking temperature and is then discharged into a drum where separation of liquid and vapor takes place. 4. Neither the British Pielsticker nor the United States Pielsticker describes the nature of the oil being treated, nor the temperature, pressure or other conditions of operation, nor the nature of the products

secured; the only oil specifically suggested for treatment in these patents is crude oil, referred to at p. 3, 1. 14, of the British patent and at p. 2, 1. 118, of the United States patent. Crude oil is not a stock suitable for cracking. 5. The only indication of the pressure used by Pielsticker is the statement at p. 3, ll. 9 and 10, of the British 1308 patent and at p. 2, ll. 112 to 116, of the United States patent, where it is indicated that the pressure employed is such as "may be created by means of a steam blast, introduced into the gooseneck Q and blowing in the opposite direction to the flow of vapors;" such pressure would be a low pressure. 6. The paragraphs at p. 2, ll. 41 to 49, and at p. 3, ll. 7 to 13, of the British patent and the corresponding passages in the United States patent at p. 2, ll. 68 to 83, describe nothing that would not occur as well in continuous distillation without cracking as in a cracking operation; these paragraphs do not therefore describe operations which necessarily or inherently involve cracking. 7. In the continuous distillation of hydrocarbon oils without cracking, the distillate product continuously produced and drawn off is lighter than the product supplied to the system; the identification of a product as lighter than the oil treated does not define the distillation as a cracking distillation. 8. Claim 6 of the British 1308 describes "apparatus for the continuous distillation of hydrocarbons and other oils and liquids;" the elements therein set forth are not described in relation to a cracking process or to any process which inherently and necessarily involves cracking. No counterpart of claim 6 of the British 1308 appears in the United States Patent. 9. Each of the Pielsticker patents is vague, indefinite and uncertain in its disclosure; neither discloses an operation such as the cracking process of the patent in suit. 10. None of the Pielsticker patents has ever been put to practical use. The master concluded that the Pielsticker patents were not prior art as against Behimer. I approve his findings and conclusions.

Summing up on this issue, I agree with the master that whether the claims in suit be construed as limited to heating in the coil and cracking in the drum (as the master held they should be construed and which holding I have adopted) or whether the claims should be construed broadly (as plaintiff contends) to include cracking either in the coil or in any locus—that, in either case, the claims would not be anticipated by the prior art and would be valid. This conclusion, that Behimer is not anticipated by the prior art—is strengthened by the decisions in two other cases, heretofore referred to: Universal Oil Products Company v. Winkler Koch Engineering Company, D.C.D.Del., 1934, Judge Nields, 6 F.Supp. 763, and Universal Oil Products Company v. Globe Oil and Refining Company, D.C.N.D.Ill.E.D., 1941, Judge Holly, 40 F.Supp. 575. In each of these cases it was held that Dubbs No. 1,392,629 was not anticipated by the prior art. It will be kept in mind that both this Dubbs patent and the Behimer patent in suit were coil and drum cracking processes with clean circulation, that eventually they ended up—after Interference No. 49,355 (with the Behimer-Dubbs disclaimer therein) and after Interference No. 55,610 (with the Dubbs-Behimer disclaimer therein)—as being distinguishable in that Dubbs was, "without substantial vaporization in the coil," and Behimer had "return of reflux by pump." In each of the two cases it was the Dubbs patent that was sued on, and in each case the respective defendants (represented by the same counsel as defendant here) asserted that the Dubbs patent was invalid because of the same prior art asserted here. The respective courts had, therefore, to consider the nature of the prior art; the courts' views concerning the prior art as against Dubbs, are of persuasive value as to the nature of this same prior art now asserted against Behimer. It is true there is no showing here, that the record in these other cases on the prior art, was or was not, substantially identical with the record here on this prior art; considering, however, that the defendants there had the benefit of the same able, and experienced counsel who represented defendant here—the inference is justified that the prior art was adequately and ably represented. It is also true that the McPherson experiment, al-

leged at the hearing here to represent the operability of the Hall process, was subsequent to Universal v. Winkler-Koch, and while prior to Universal v. Globe, is not referred to in the court's opinion; however, since the conditions of the McPherson experiment were so different from the disclosure of the Hall patent that no conclusions as to the operability of Hall as a recycling process could be drawn from McPherson, and since defendant, as above noted, has apparently abandoned its argument on McPherson, this omission does not impair the persuasiveness of the courts' conclusions.

█ Finally, defendant alleges that the Behimer patent is invalid because neither the patentee Behimer nor his assignee, the plaintiff, knew at the time of the filing of the original application for said patent, of any means in commercial operations for returning reflux to the inlet of the heating coil. This defense is supported by Universal Oil Products Company v. Globe Oil & Refining Company, D.C., 40 F.Supp. 575, referred to above, where the court said at page 580: "The failure of the Behimer system to operate was not the result of carelessness in construction, but was due to a fundamental defect, a lack of any means, conceived by Behimer, of successfully returning the reflux to the heating coil." While it is true that at the time of the filing of his application, neither Behimer nor plaintiff knew of a satisfactory means in commercial operations for returning the hot reflux, nevertheless, there were then available and known to the art generally, two different types of hot oil pumps, each capable of handling the hot reflux condensate in Behimer's process: the first was a jet pump, the existence and availability of this pump is shown by the testimony of Lindeman; the second was the Thompson surge pump which was available to Behimer and Texas Company at the time of the filing of the application, this pump was able to handle hot oil successfully at temperatures as high as, or higher than, those used in the Behimer operation, e. g. as high as 750°. Much of

the evidence submitted here on the existence, availability and operability of hot oil pumps, both jet and surge, was not presented in Universal v. Globe; the persuasiveness of the above quoted finding is affected accordingly. The fact that the pumps capable of handling hot oil were known in the art at the time Behimer filed his application, was sufficient disclosure to the man skilled in the art, and was sufficient to show utility—even though neither Behimer himself nor Texas Company then and there had knowledge of such pumps; plaintiff here has made sufficient showing of the utility of the Behimer invention. The Telephone cases (Dolbear v. American Bell Telephone Co.), 1888, 126 U.S. 1–535, 8 S.Ct. 778, 31 L.Ed. 863; Highway Appliance Co. v. American Concrete Expansion Joint Co., 7 Cir., 1937, 93 F.2d 113; International Standard Electric Corp. v. Ooms, 1946, 81 U.S.App.D.C. 215, 157 F.2d 73.

During such intervals as I could spare from the hearing of a crowded trial calendar, I have given this case the protracted and careful study that its complexity and importance deserve. My consideration has been greatly aided by the master's report—obviously a thorough, painstaking document, well supported both as to the facts and the law, and in keeping with the learned and exhaustive presentations made by the respective counsel. This opinion expresses in a general way my views on the issues; to go into additional detail, would only further lengthen what is already overly long, and would seem unnecessary. Plaintiff has filed three additional objections—I, XXIII and XXIX, relating to suggested revisions of the wording of Findings F.F. 29(b), 85(b) and 261(d) respectively; in my view, the proposed revisions improve the accuracy of the respective findings and therefore, the three objections are sustained. With these exceptions, all the objections of both plaintiff and defendant are overruled; the report is confirmed; and the cause will be dismissed at plaintiff's costs. Defendant will prepare decree accordingly.